# F. S. FITZMAURICE v. C. C. WILLIS, A. J. DeLance, Ralph Abbott, S. H. Elliott, E. H. Emerson, as the Board of County Commissioners for Ward County, North Dakota.

(127 N. W. 95.)

**Constitutional Law — Titles to Legislative Acts.**

1. That part of § 21, chap. 109, Laws 1907, providing that the list of names of those voting at the primary election shall take the place of the first registra-tion of the voters now required, and that notice only shall be given of the date of the second day of registration, is an attempt to amend the law pro-viding for the registration of electors, and is in conflict with § 61 of the state

Note.—As to validity of registration laws, see note in 45 L. ed. U. S. 214, and notes in 23 Am. Dec. 642, and 54 Am. Rep. 843.

Constitution, which provides that no bill shall embrace more than one subject which shall be expressed in its title, and is void.

**Constitutional Law — Subjects and Titles — Statutes.**

2. The title to chapter 109, Laws of 1907, is, "An Act to Provide for the Selection of Candidates for Election, by Popular Vote, and Relating to Their Nomination and the Perpetuation of Political Parties." Such title in no manner expresses the substance of the attempted amendment to the registration law, and such amendment is not germane to the subject expressed in the title, hence the act in question embraces more than one subject.

**Voters and Elections — Words and Phrases — "General Election."**

3. The provision of the general registration law which fixes the first day of registration as the Tuesday two weeks preceding a general election or any city election remains in full force and effect.

**Voters and Elections — Registration — Qualifications of Electors — Affidavit in Place of Registration.**

4. Electors are not entitled to vote on the question of dividing a county and creating a new county, submitted at a general election, unless their names are contained on the registry list required in cities of 800 inhabitants or more, without furnishing the affidavit prescribed as a substitute for registration.

**Voters and Elections — Qualifications of Electors — Legislative Regulation — Words and Phrases — "General Election."**

5. The term "general election," found in the registration law, was there used to identify and designate the whole election held on the Tuesday after the first Monday in November in even-numbered years.

**Voters and Elections — Qualification of Voters — Power of the Legislature — Regulation.**

6. The legislative assembly may prescribe reasonable regulations to prevent fraud, preserve order, and insure a fair election, and to that end may prescribe the method by which the qualifications of those offering their votes as electors may be proved, and prohibit the reception of votes unless the requisite proof is made.

**Voters and Elections — Construction of Statutes — Mandatory Provisions.**

7. The prohibition contained in § 738, Rev. Codes 1905, reading, "No vote shall be received at any election in this state if the name of the voter offering such vote is not on the registration list, unless such person shall furnish to the judges of the election his affidavit stating that he is a resident of such precinct, giving his place of residence," etc., is within the power delegated to the legislative assembly to prescribe reasonable regulations for making proof of the qualifications of those offering to vote at an election.

**Voters and Elections — Failure to Register — Illegal Votes.**

8. The prohibition contained in § 738, Rev. Codes 1905, reading, "No vote

shall be received at any election in this state if the name of the voter offering such vote is not on the registration list, unless such person shall furnish to the judges of the election his affidavit stating that he is a resident of such precinct, giving his place of residence," etc., is an express prohibition, and is mandatory, and votes received in violation thereof are invalid, and cannot be counted.

### Voters and Elections — Registration Requirements Mandatory.

9. At the general election held in 1908 the question of creating the county of Renville from a portion of Ward county was submitted to the voters of Ward county, and a large number of persons voted thereon in the city of Kenmare without being registered, or making proof on the day of election of their qualifications as electors as required by § 738, Rev. Codes 1905, and their votes were received and counted by the canvassing board. *Held* in a contest over the result of the election on such question, that the votes of all persons so voting must be rejected.

### Voters and Elections — Registration Laws.

10. The prime purpose of the registration law is to prevent the perpetration of frauds in elections, and it must be construed in the light of such object. The object of the meeting of the board of registration on the dates fixed by statute preceding each general election is to provide for the preparation of the registration list, which is the culmination of the proceedings of the board of registration, without which their meetings and acts would be futile, as well as all other provisions of the registration statute.

*Held*, under all ordinary circumstances, the presence and use of such a list on the day of election in cities coming under the terms of the registration law is mandatory, and that all votes received in the absence of such list, and without being accompanied by the affidavit required of nonregistered voters, must be rejected.

### Elections — Conduct — Statutory Provisions.

11. Section 2334, Rev. Codes 1905, provides that no refusal or neglect on the part of any official to perform his rightful duty in connection with an election on the division of counties shall in any wise affect the validity of such election, applies to the minor details and irregularities of such officers, and the conduct of the election, and not to the mandatory requirements of the registration and election statutes, and in case no registry list is present or used at the polls, the duty is upon the persons seeking to vote to furnish the statutory affidavits, and, failing to do so, their votes should neither be received nor counted.

Opinion filed June 3, 1910.

Appeal from the district court of Ward county; *Templeton,* Special Judge.

Contest on an election held to vote upon the creation of the new county of Renville.

Reversed.

*Geo. L. Reyerson* and *Geo. A. Bangs,* for appellant.

Failure to comply with a registration law invalidates an election. Cooley, Const. Lim. 757; Capen v. Foster, 12 Pick. 485, 23 Am. Dec. 632; People ex rel. Foley v. Kopplekom, 16 Mich. 342; State ex rel. Doerflinger v. Hilmantel, 21 Wis. 574; State ex rel. Bancroft v. Stumpf, 23 Wis. 630; State v. Butts, 31 Kan. 537, 2 Pac. 618; Pope v. Williams, 98 Md. 59, 66 L.R.A. 398, 103 Am. St. Rep. 379, 56 Atl. 543, approved in 193 U. S. 621, 48 L. ed. 817, 24 Sup. Ct. Rep. 573; Falltrick v. Sullivan, 119 Cal. 613, 51 Pac. 947; Zeiler v. Chapman, 54 Mo. 502; Patterson v. Hanley, 136 Cal. 265, 68 Pac. 821; State to use of DeBerry v. Nicholson, 102 N. C. 465, 11 Am. St. Rep. 767, 9 S. E. 545; Owensboro v. Hickman, 90 Ky. 629, 10 L.R.A. 224, 14 S. W. 688; Cusick's Election, 136 Pa. 459, 10 L.R.A. 228, 20 Atl. 574; Moore v. Sharp, 98 Tenn. 491, 41 S. W. 587; 15 Cyc. Law & Proc. p. 302B; McCrary, Elections, 135.

*Gray & Gray, P. M. Clark, L. F. Clausen,* and *Scott Rex,* for respondents.

There was a *de facto* registration. State ex rel. Wood v. Baker, 38 Wis. 83; State ex rel. Hampton v. Waldrop, 104 N. C. 453, 10 S. E. 694; Stinson v. Sweeney, 17 Nev. 309, 30 Pac. 997; People ex rel. Martin v. Worswick, 142 Cal. 71, 75 Pac. 663.

The registration law is not mandatory. Johnson v. Grand Forks County, 16 N. D. 363, 125 Am. St. Rep. 662, 113 N. W. 1071; 10 Am. & Eng. Enc. Law, p. 736; Taylor v. Taylor, 10 Minn. 107, Gil. 81; State ex rel. Douglas v. Falk, 89 Minn. 269, 94 N. W. 879; Edson v. Child, 18 Minn. 64, Gil. 43; Kuykendall v. Harker, 89 Ill. 126; Dale v. Irwin, 78 Ill. 170; Perry v. Hackney, 11 N. D. 148, 90 N. W. 483; Cooley, Const. Lim. 7th ed. 928; Horning v. Board of Canvassers, 119 Mich. 51, 77 N. W. 446; Jones v. State, 153 Ind. 440, 55 N. E. 229; Capen v. Foster, 12 Pick. 485, 23 Am. Dec. 632; Byler v. Asher, 47 Ill. 101; Edmonds v. Banbury, 28 Iowa, 267, 4 Am. Rep. 177.

The provisions of a registration do not apply to a special election. Seymour v. Tacoma, 6 Wash. 138, 32 Pac. 1077; Graves v. Seattle, 8

Wash. 248, 35 Pac. 1079; Bew v. State, 71 Miss. 1, 13 So. 868; Kaigler v. Roberts, 89 Ga. 476, 15 S. E. 542; Stephens v. Albany, 84 Ga. 630, 11 S. E. 150; Thomasville v. Thomasville Electric Light & Gas Co. 122 Ga. 399, 50 S. E. 169, 10 Am. & Eng. Enc. Law, p. 611, note 4, and cases cited; 15 Cyc. Law & Proc. p. 302-c; State ex rel. Manhattan Constr. Co. v. Barnes, 22 Okla. 191, 97 Pac. 997.

SPALDING, J. This is an appeal from a judgment of the district court of Ward county holding that the proposition submitted in that county at the last general election for the formation of the new county of Renville from a portion of Ward county failed to carry. Judgment was entered in a contest proceeding held as provided by § 693, Rev. Codes 1905. The facts, so far as necessary to an understanding of the questions involved, are that the question of creating the new county of Renville from a portion of Ward county was submitted at the general election in 1908, and the vote, as returned, showed 3,744 for the creation of the new county and 4,275 against it. The judgment of the district court cut down the majority to about 477. The contention on this appeal arises over the vote of the three wards comprising the city of Kenmare, it being urged by the contestant that none of the votes cast in that city should be counted. If this be true, a majority in favor of the creation of the new county results. At the general election in 1906, 161 votes were cast in Kenmare. At the primary election held in June, 1908, the total number of votes cast was 207. Under the provisions of the Code relating to registration, the vote at the 1906 general election brought Kenmare within the terms of the law requiring a registration of voters. At the general election in 1908, on the question of the division and the formation of the new county, there were cast in the three precincts of the city 625 votes against the new county and 2 in favor of it. This number was reduced by the recount in the district court. The primary election was held in June, 1908, but the list of names of those who voted thereat was not in the possession of or used by the election officers at the general election in 1908, nor was any list purporting to be a registry list used. No meeting was held to correct registry lists, as required by the general law regarding registration, and none of the

voters furnished affidavits showing their qualifications as electors before voting at the general election.

1. Section 21, chapter 109, Laws of 1907, which chapter is known as the primary election law, requires the clerks of election to keep a list of all persons voting at such election, in duplicate, one of which remains a part of the record of the primary election and the other is required to be delivered to the board of registration within thirty days after the election, and reads: "The poll list so kept at the primary election and delivered to the boards of registration shall take the place of the first registration of the voters now required, and notice only shall be given of the date of the second day of registration, which shall be held and conducted as now provided, and no other shall be _e-quired to vote at the general election following."

The registration law, aside from this provision, as contained in article 16, chapter 8, of the Political Code, commencing at § 732, Rev. Codes 1905, requires the persons authorized to act as judges of election in villages, cities, and wards coming under the provisions of the registration law, who, with the inspector of election, constitute the board of registration, to meet on the Tuesday two weeks preceding any general election, or any city election, and make a list, in the manner prescribed, of all persons qualified to vote at the ensuing election in such precinct, such list, when completed, to be known as the registry of the electors of such precinct. It is required that such board shall complete, as far as practicable, such registry list on the day of such meeting, certify the same in the manner prescribed, and file it with the board, and that it shall be kept by one of the judges or the inspector, by whom it shall be carefully preserved for subsequent use. Another copy of the list is required to be posted in a public or conspicuous place at or near the place where the next preceding election in such precinct was held, and to be accessible to any elector desiring to examine it or make copies thereof. Such board is required to again meet on Tuesday next preceding such election for the purpose of revising, correcting, and completing such list.

Section 738 reads as follows: "After such lists shall have been fully completed, such board shall, within two days, cause two copies of the same to be made, each of which shall be certified by it to be a correct list of the qualified electors of the precinct so far as known,

which list the judges or inspector shall carefully keep and preserve for use on election day; and at the opening of the polls the judges or inspector shall designate two of their number to check the name of each voter voting in such precinct whose name is on the register. No vote shall be received at any election in this state if the name of the person offering such vote is not on the register, unless such person shall furnish to the judges of election his affidavit, stating therein that he is a resident of such precinct, giving his place of residence and length of time he has resided there, and also prove by the oath of a householder and registered voter of the precinct that he knows such person to be a resident therein, giving his place of residence. Such oath may be administered by the inspector or one of the judges of election, or any other person authorized to administer oaths, but no person shall receive any compensation for administering such oath. Such oath shall be preserved and filed by the judges of election. Any person may be challenged and the same oath required as is now or hereafter may be prescribed by law."

The clerks of the election are required to enter on the poll list kept by them on the day of election the words "not registered" opposite the names of the persons who are not registered, but who vote by the use of the affidavit referred to, and to insert in the poll list the names and residences of such voters.

The provisions of § 21, chapter 109, Laws of 1907, that the list so kept at the primary election and delivered to the boards of registration shall take the place of the first registration of the voters required by article 16, chapter 8 of the Political Code, and that notice only shall be given of the date of the second day of registration, and that no other notice shall be required to vote at the general election following, is in conflict with § 61 of the state Constitution, which provides that no bill shall embrace more than one subject which shall be expressed in its title. The title to chapter 109 is, "An Act to Provide for the Selection of Candidates for Election, by Popular Vote, and Relating to Their Nomination and the Perpetuation of Political Parties." It is quite apparent that this chapter relates, so far as disclosed by the title, only to the nomination of candidates for office. No intimation is contained in the title, or warning given thereby, that anything may be found in the body of the act amending the law relating to the regis-

tration of voters, or to the proof of the qualifications required of an elector to entitle him to vote. It is an attempt to amend the general registration law when the remainder of the act has no relation to that subject and without notice in the title of the act of such amendment. The subject of amending the registration law is not germane to the subject of nominating candidates for office. It would be equally as germane to the subject of nominations by convention, and might, with equal relevancy, be contained in the law providing for holding political caucuses, or conventions. The identical question has been passed upon by the supreme court of Nebraska in the case of State ex rel. Adair v. Drexel, 74 Neb. 776, 105 N. W. 174, to which we have heretofore referred in several opinions, and which we have cited with approval. The primary election law of Nebraska provided that the date of the primary election should be the first day for registration of voters in all cities and counties where registration was required. The title of the act was, "An Act to Provide for Primary Elections . . . and to Regulate the Same; to Provide for the Nomination of Certain Candidates, . . . [and] for the Election of Delegates to . . . Conventions," etc. In the opinion of that court we find the following language: "Whatever may be the true explanation of these provisions being found in the primary election law under consideration, or what may have been the real purpose of the legislature in incorporating them in the act as passed, we think it is manifest that they cannot be upheld as a constitutional exercise of legislative authority. These provisions relate to a registration law applicable to general elections rather than to a primary election. They are manifestly amendatory to the general registration laws. As a registration law the new act is altogether incomplete and imperfect. The provisions regarding the registration of voters, found in the legislation we are considering, are not embraced within, nor comprehended by, the title to the act, and their incorporation therein is therefore a contravention of the fundamental law, which declares: 'No bill shall contain more than one subject, and the same shall be clearly expressed in its title. And no law shall be amended unless the new act contains the section or sections so amended, and the section or sections so amended shall be repealed.' Const. art. 3, § 11. The title to the act relates exclusively to the subject of primary elections for the nomination of certain

candidates and delegates, and to the repeal of existing laws in conflict therewith. The provisions under consideration refer especially to the subject of the registration of voters, and is in its effect amendatory of existing statutes. These provisions are foreign to the subject-matter embraced in the title of the act." See also § ·64 of the Constitution of North Dakota.

2. The provision in § 21, chapter 109, referred to, being in conflict with the Constitution and invalid, leaves those provisions of the registry law hereinbefore referred to and which the legislature attempted to amend, still in force and effect.

3. The learned judge of the trial court held that no registration was required to entitle the electors of Kenmare to vote upon the proposition of creating a new county. He evidently based this conclusion on the language employed by this court, and the writer hereof in State ex rel. McCue v. Blaisdell, 18 N. D. 31, 119 N. W. 360, in which it was held that the provision ·in the primary election law whereby electors were permitted to express their choice for United States Senator at the general election was, in a strict legal sense, a separate election, though held, for certain reasons, in connection with the general election and as a part of it. We think both court and counsel failed to correctly apply the language there used to the facts of the present case. We are of the opinion that when the registration of electors is required, or in lieu thereof the furnishing by them of affidavits showing their qualifications as a prerequisite to receiving their votes at a general election, the term "general election" is used in the statute containing these requirements to identify and designate the whole election held on the Tuesday after the first Monday in November in even-numbered years, and that it applies to all electors desiring to vote on that day either for the election of state officers, or on any other question submitted at the same time, and that unless such electors are registered or furnish the affidavits referred to as a substitute for registration, they are not entitled to vote. McCrary, Elections, § 194. An inspection of the election laws and the procedure which is prescribed and required to be followed by the officers of election supports this theory. Provision has not been made for the preservation of a list of those voting on special questions separate from those voting for state officers, or of those voting small ballots who do not vote the large one, except in the case of women.

4. Are the provisions of the registry law, and particularly those of § 738, mandatory or merely directory? Does the reception of votes in the election precinct, wherein a registration is required to be held, when none was in fact held, and without the voters furnishing, and the election officers receiving, affidavits required to show their qualifications, render the vote so received invalid? The answer to this question depends upon the construction which must be placed upon the phrase, "No vote shall be received at any election in this state if the name of the person offering such vote is not on the register, unless such person shall furnish to the judges of election his affidavit stating therein that he is a resident of such precinct, giving his place of residence," etc. It is argued that, because it is not provided in express language that votes so received shall be void, they must be counted. We cannot assent to this contention. Language could hardly be framed indicating more clearly than the express prohibition quoted, that votes shall not be received except on the conditions named. It is equivalent to the use of express language, that votes so received shall be void or not be counted. Negative words are generally held to be mandatory. Cusick's Election, 136 Pa. 459, 10 L.R.A. 228, 20 Atl. 574. If the qualified voter who has not submitted proof of his qualifications votes, he may not commit a crime, but he does an act which is penalized by the language of the section quite as emphatically as though it read that no such vote shall be counted. If it is illegal to receive the vote, the act of receiving or giving it cannot be legalized and given effect by the unlawful act of receiving it. Any other interpretation of the language of the section renders it meaningless, and leaves it wholly within the discretion of the election officers to comply with the law or not. The Constitution permits the legislature to prescribe regulations for the conduct of election. Section 129. Under such provision, or even without it, the legislature may prescribe reasonable regulations to prevent fraud, preserve order, and insure a fair election, and to that end may prescribe the method by which the qualifications of those offering their votes as electors may be proved, and prohibiting them from voting or their votes from being received if offered, unless such proof is made. That the provision quoted is within the power delegated to the legislature in these regards is clear. The purpose of the constitutional provision referred to is to provide for the

enactment of a law requiring the registration of electors. It deprives no one of his right to vote, and is only a reasonable regulation under which he may exercise such right. Cooley, Const. Lim. 6th ed. 758. Judge Cooley says: "Where the law requires such a registry, and forbids the reception of votes from any persons not registered, an election in a township where no such registry has ever been made will be void, and cannot be sustained by making proof that none in fact but duly qualified electors have voted. It is no answer that such a rule may enable the registry officers, by neglecting their duty, to disfranchise the electors altogether. The remedy of the electors is by proceedings to compel the performance of the duty, and the statute, being imperative and mandatory, cannot be disregarded." In support of this see the following cases: Capen v. Foster, 12 Pick. 485, 23 Am. Dec. 632; People ex rel. Foley v. Kopplekom, 16 Mich. 342; Re Duffy, 4 Brewst. (Pa.) 531; Falltrick v. Sullivan, 119 Cal. 613, 51 Pac. 947; State ex rel. Harris v. Scarborough, 110 N. C. 232, 14 S. E. 737, 6 Am. & Eng. Enc. Law, p. 290; Smith v. Skagit County, 45 Fed. 725; State ex rel. Doerflinger v. Himantel, 21 Wis. 574; State ex rel. Bancroft v. Stumpf, 23 Wis. 630; People ex rel. Ellsworth v. Laine, 33 Cal. 55; Cusick's Election, 136 Pa. 459, 10 L.R.A. 228, 20 Atl. 574; Edmonds v. Banbury, 28 Iowa, 267, 4 Am. Rep. 177; State v. Butts, 31 Kan. 537, 2 Pac. 618; State ex rel. O'Neill v. Trask, 135 Wis. 333, 115 N. W. 823; McCrary, Elections, 3d ed. §§ 91, et seq. 4th ed. §§ 127, et seq.

An inspection of the provisions and the language of our registration law, and a comparison of the provisions of chapter 445 of the 1864 Wisconsin Laws, are sufficient to satisfy us that our law was copied from that Wisconsin law. It is unnecessary to parallel the different sections of the two laws, but is sufficient to note the similarity between § 738, Rev. Codes 1905, which, with the exception of a few verbal changes, was enacted as § 8 of chapter 122 of the laws of 1881 of Dakota territory. We have quoted § 738, supra. Section 7 of the Wisconsin law referred to reads as follows:

"After said lists shall have been fully completed, the said inspectors shall, within three days thereafter, cause four copies of the same to be made, each of which shall be certified by them to be a correct list of the voters of their district, one of which shall be filed in the office of the

town clerk of towns, in the office of village clerk of villages, and the office of the city clerk of cities, and one of which copies shall be delivered to each of the said inspectors. It shall be the duty of said inspectors so receiving such list, carefully to preserve the said list for their use on election day, and to designate two of their number, at the opening of the polls, to check the name of every voter voting in such district, whose name is on the register. No vote shall be received at any annual election in this state, unless the name of the person offering to vote be on the said register made on the Tuesday or Wednesday preceding the election, unless the person offering to vote shall furnish to the board of inspectors his affidavit in writing, giving his reasons for not appearing in the day for correcting the alphabetical list, and prove by the oath of a householder of the district in which he offers his vote, that he knows such person to be an inhabitant of the district, and, if in any incorporated village or city, giving the residence of such person within said district. The oath may be administered by any one of the inspectors of election, at the poll where the vote shall be offered, or by any other person authorized to administer oaths, but no person shall be authorized to receive compensation for administering the oath. Said oath shall be preserved and filed in the office of the town, village, or city clerk. Any person whose name is on the register may be challenged, and same oaths shall be put as now are, or hereafter may be, prescribed by law."

In the Hilmantel Case, supra, the Wisconsin court construed § 7, chapter 445, Laws of 1864, in an action to determine who had been elected clerk of the board of supervisors. Hilmantel had received the certificate, and the complaint alleged that of the votes given and counted for Hilmantel in Milwaukee, 544 were received from persons whose names were not on the register, and no one of whom gave to the inspectors receiving his vote his residence within the district, either by his own affidavit or by the oath of a householder of such district, and that of such votes 145 were received from persons no one of whom proved to the inspectors by the oath of a householder of the district that he knew such person to be an inhabitant of the district, nor did any of them furnish the inspectors any proof upon oath that he was a resident of the election district. Chief Justice Dixon, who wrote the opinion, after explaining his former views of the subject and stating

that he had supposed that the question always was, who had received the greatest number of votes from legally qualified voters, without regard to any matter of mere form or want of form in the receiving, canvass, or return of votes, and his regret that the law in question did not admit a construction in accordance with his previous understanding, says that, after an examination of the law, he finds it "essentially an imperative statute, and deprives the inspectors of all jurisdiction to receive the votes of unregistered voters, unless the conditions as to the affidavit and oath are fully complied with." That under former statutes, "no duty was imposed upon the voters except that of going to the polls and depositing their votes. . . . In this matter of a voter, whose name has been omitted and who has not appeared on the day for the correction of the register, the burden of answering the requirements of the law by furnishing the affidavit and proof is thrown upon the voter himself. He is presumed to know the law, and must go to the polls prepared to comply with its conditions; and if he does not, and his vote is lost, it may, so far as it is the fault of any one, with justice be said to be his own fault. It is in the nature of a penalty imposed by the law for his neglect to do what is required of him. The inspectors cannot receive his vote, and if they cannot, it cannot afterwards be received and counted by the courts. . . . It is difficult to conceive any language more strongly imperative than this." He then considers the nature of the act and its object, and continues: "The disability or disfranchisement is inseparable from the necessary protection. Perhaps it may be said that the protection could only be afforded by imposing the disability. Hold the act to be directory, and allow the electors to vote without their names being registered, and without the affidavit and oath prescribed in case they are not, and the object of the legislature would be entirely defeated. The effect of such construction would be fatal to all protective legislation, and would leave the election laws precisely as they stood before this statute was enacted." A demurrer to the complaint of the contestant was overruled. A petition for a rehearing was submitted, the substance of which is contained in the report of the case. It covers nearly every ground suggested by the respondent in the case at bar, but it was denied. This case was decided in 1867. In 1869 the same provisions of the law were again before that court in State ex

rel. Bancroft v. Stumpf, 23 Wis. 630. It was held in that case that where there was no registry of voters of a town, and none of the persons who voted therein at an election furnished the affidavit required by law to entitle the vote of a nonregistered elector to be received, the whole vote of the town must be rejected in quo warranto. The action was to determine the title to the office of county treasurer.

In State ex rel. O'Neill v. Trask, 135 Wis. 333, 115 N. W. 823, persons not registered voted on executing affidavits furnished by the election officers. Such affidavits were defective, not stating the facts required by the statute. It was claimed that inasmuch as the affidavits furnished by the election officers were the only ones available to them, they had a right to rely on them as sufficient proof of their right to vote, and that since they were in fact electors and residents of the district, their votes should not be rejected after having been received. The court held that the language of the statute was clear and positive to the effect that no votes should be received if the name of the person offering the vote was not on the registry, unless he furnished the proof required by the statute showing his right to vote.

Respondent relies especially upon Minnesota authorities as holding similar provisions of the Minnesota registration law as only directory. That law is quite dissimilar to ours, but the section corresponding to § 738, while differing generally, does contain this language: "At such election no person shall vote whose name is not upon such list at the time of opening the polls." It was held in Taylor v. Taylor, 10 Minn. 107, Gil. 81, that the failure of the officers to perform any administrative act in relation to the election could not invalidate it if the electors had no actual notice and there was no mistake or surprise. In that case there was no registry poll list made. This decision was followed in Edson v. Child, 18 Minn. 64, Gil. 43, and in Soper v. Sibley County, 46 Minn. 274, 48 N. W. 1112, but the opinion in those cases furnish very unsatisfactory reasons for the conclusions arrived at, and in the Taylor Case the dissenting opinion written by Judge Berry is far more convincing than that of the majority of the court.

In the Edson Case Judge Berry, who wrote the opinion, states that, in his opinion, the rule laid down in the Taylor Case is unsound and

20 N. D.—25.

unwholesome, and that if it were a new question he should take the same position that he took in his dissenting opinion in that case.

In the Soper Case the invalidity claimed consisted in a failure to post the list of electors, and it was held that such failure was not fatal, but this is not an authority on the question we are now considering. In State ex rel Harris v. Scarborough, 110 N. C. 232, 14 S. E. 737, the supreme court of North Carolina held that the vote of a voter should be received and counted if he offered to comply with the laws in reference to registration, and was prevented by the wrongful conduct of the registrar, but if the vote was cast upon an invalid registration it should be rejected, and that it could not be counted by proving that none but duly qualified electors voted. We are of the opinion that the Wisconsin authorities cited are controlling in this case, and we must therefore hold the statute prohibiting the receipt of a vote, unless the voter has registered, or furnishes the affidavit required by the statute, mandatory.

5. Respondent urges that the primary election held in June, 1908, in Kenmare, notwithstanding the provision of the primary law substituting that election for the first day of registration is unconstitutional, constituted a *de facto* registration of those electors who voted thereat, and that, therefore, their votes should be counted. We have given this matter long and earnest consideration, and have reached the conclusion, on the facts found in this case, that this is immaterial, hence we need not determine whether it was a *de facto* registration or not. The prime purpose of the law requiring the registration of voters is to prevent fraud at elections. It contemplates that the registration list shall be in the hands of the election officials at the polling place on the day of election, and that voters who have been registered shall have their names checked off on the registration list, while those who are unregistered shall furnish the affidavit prescribed as necessary to entitle them to vote. The names of the latter are then placed upon the poll list and marked "not registered." This prohibition against receiving the votes of persons not registered unless they furnish the statutory affidavit, and all other requirements of the registration and election laws, bearing on this subject, are merely idle enactments and wholly useless, unless the registry list is present and used at the election. That list furnishes the only means provided whereby the elec-

tion officers are advised as to the possession by the voters of the neces-
sary qualifications to entitle them to cast their ballots. It is the con-
summation of the registration system. Of what effect is the require-
ment that the registration board sit on a certain day, that they meet on
a subsequent day to revise the list prepared on the first day, that such
list be posted for the information of the public and of candidates, un-
less it is to be used, when revised and corrected, on the day of election?
Without it the officials are practically powerless to prevent the very
fraud which it was sought to guard against. All the registration pro-
ceedings have been conducted to the end that such list may be pre-
pared and used. We are not unmindful of the fact that the right to
vote is one of the most sacred privileges of American citizenship, and
that it largely distinguishes citizenship in a Republic from citizenship
in a Monarchy. But what value attaches to it, if the qualified elector
may be personated by one possessing none of the qualifications neces-
sary to entitle him to vote? What greater heritage is possessed by
the qualified elector than by an alien, or an illegal voter, or one totally
lacking the qualifications of an elector, if these latter may, with im-
punity offset and nullify the results of the exercise of the privilege
possessed under the law and the Constitution by those who have a
right to exercise that privilege? Unless this right is protected, the
elector is deceived and defrauded at the very fountain head of his
citizenship, and through the acquiescence of those to whom he has the
right to look for protection. The Constitution contemplated the en-
actment of a registration law that the right of the elector may be
exercised, under such reasonable limitations as will serve to identify
him and tend to prevent the perpetration of wholesale frauds. It is
argued that the result of holding that the registry list must be present
and used at the election in this case will deprive a part of the legal
voters of their votes. This may be true, but they are not entitled to
exercise their rights as electors until they have proved their qualifi-
cations, and the loss of the votes of a few qualified voters in a par-
ticular instance is of trifling importance as compared with the evils
which would necessarily result from throwing open the doors and in-
viting fraud in all matters in which there are active contests, thereby
leaving the rights of qualified electors unprotected and the citizenship
of the state or the community subject to the ignorance, malice, or

corrupt practices of a few election officers or interested and unscrupulous participants. We repeat, that to hold the presence of the registry list at the polling place unnecessary would nullify all the other features of the registration law and render the attempt of the legislature to furnish protection ineffectual. Of course there are many things in connection with the registration law with reference to which an exact compliance is not necessary, but not so with requirements which a failure to comply with would leave it within the easy power of election officials and others to defeat the purpose and wholesome intent of the legislature in prescribing a means of testing the qualifications of those offering their ballots. Much of the language of Judge Wallin in Miller v. Schallern, 8 N. D. 395, 79 N. W. 865, is pertinent in this case. We cannot quote at length, but among other things he says: "The state has therefore safeguarded the privilege of voting and the purity of elections, not merely by casting duties upon certain officers, but also by affording the voter an opportunity to see and know personally whether or not he is voting a lawful ballot, i. e., an official ballot. If he neglects to notice whether the paper delivered to him is a lawful ballot, properly indorsed as such, and proceeds, either negligently or wilfully, to deposit an unlawful ballot in the box, he must then accept the consequences of his own acts, and lose his vote. In such case, as in the illustrative examples already given, the loss of the vote is the result of the voter's own acts. True, in the case at bar, the official is derelict also; but this does not alter the fact that the voter had the legal right to demand and receive an official ballot from the precinct officers, and, if he fails to exercise this privilege, he has himself to blame; nor can the official be saddled with the whole responsibility of the omission. . . . Election laws are framed upon the supposition that the voters are sufficiently enlightened to know their provisions; nor can such laws be enacted upon the contrary without inviting anarchy and political chaos."

In Perry v. Hackney, 11 N. D. 148, 90 N. W. 483, this court held that, in construing the provisions governing the conduct of elections, they should be held mandatory when the purpose of the law-making power would be plainly defeated by a violation of such provisions, and that in construing them every positive requirement which, if disobeyed,

would necessarily defeat the purpose of the requirement, should be held mandatory.

From what we have said, we feel that it is clear that the application of these principles compels the conclusion that the presence and use of the registry list at the polls on election day was, in the case at bar, essential to a valid vote in the three precincts of Kenmare except as to electors who might furnish the statutory affidavit. The trial court found that at the general election in 1906 only 161 votes were cast for governor in those precincts; that at the primary election in 1908, 207 votes were cast. No finding was made, and no hint or suggestion is offered, that there was any such increase of population in Kenmare between June and November, 1908, as to warrant any court to concluding that, had the requirements of the registration law been complied with, there would have been an increase from 207 to 627 votes between June and November. Under the authorities, one of the most marked indications of fraud in the conduct of an election is a sudden and unexplained material increase in the number of votes cast.

The authorities which we have cited, supra, are in harmony with our conclusions. In State ex rel. Wood v. Baker, 38 Wis. 71, the supreme court of Wisconsin held that, although the registration list was irregularly prepared, yet, in view of the fact that it was present and used at the polling place and the voters could observe its use when offering their ballots, and therefore were without any sort of warning that additional proof of their right to vote was necessary, that their votes should be counted. The doctrine of the decision seems to be that had they found no registry list in use when offering their ballots, their votes would have been challenged by law, and on their failure to furnish the required affidavit, similar to the one required by our statute, their votes should not be received, or counted if received. The opinion as a whole, and the reasoning of the court, support our conclusion in the case at bar. In State ex rel. Harris v. Scarborough, 110 N. C. 232, 14 S. E. 737, it is held that a vote cast upon an invalid registration should be rejected, and that one who seeks to vote without complying with the requirements of the registration law must show that he offered to do all required of him by such law, and was prevented by the fault of the officers. And the court says: If, in the face of the statute which required the elector to place upon the registration book

certain facts connected with his own history, "the courts should declare its provisions merely directory, and thus thwart the manifest purpose of an independent co-ordinate branch of the government when acting within the limit of its power, they would .establish a precedent far more dangerous to liberty and constitutional government than all of the real or imaginary evils or inconveniences that might arise from the enforcement of the statute."

In Cusick's Election, 136 Pa. 459, 10 L.R.A. 228, 20 Atl. 574, it is held that the primary object of the law requiring affidavits of un-registered electors to entitle them to vote was to prevent fraudulent voting, and that it must be so considered as best to carry out that intent, and that one whose affidavit was not in compliance with the require-ments of the law was not entitled to vote, that the statute was manda-tory, and that until an elector had established his qualifications in the manner pointed out by the law, he was not even a prima facie qualified elector, and that court says: "As before remarked, the con-tention upon this point settles down to the *argumentum ab incon-venienti*. It may be that the careless voter who does not value his privilege sufficiently to see, as every voter can see with very little trouble, that his name is placed upon the registry list, and who gives no thought to the means to establish his right to vote until he comes to the poll to deposit his ballot, may suffer some inconvenience and in some instances lose his vote, not because he is not duly qualified, but for the reason that he has not the means of proof at hand to satisfy the tribunal which the law has appointed to hear his case. So, the litigant in a suit at law may be defeated though his case be never so good, if he fail to produce his evidence at the proper time. When an un-registered elector offers his vote at the polls, the law challenges it in-stantly, and he knows that he can only avoid the challenge by a strict compliance with the requirements of the statute. If he comes to the poll without his proof, it is his own folly and improvidence. He has no right to expect that his indifference to his rights, or indolence in asserting them, are to be condoned by nullifying the provisions of a law which is the main bulwark of the purity of the ballot, and which deprives no qualified elector of his right, except as the result of his own indifference to his duties as a citizen."

See also People ex rel. Foley v. Kopplekom, 16 Mich. 342. In

State ex rel. Hampton v. Waldrop, 104 N. C. 453, 10 S. E. 694, it was held that the registration book should present and use for the purpose prescribed by law at the voting place, and that it could not be dispensed with in any case if it could be produced; that if lost or destroyed by accident or fraud the voter would not be deprived of his vote if he was properly registered. In Morril v. Haines, 2 N. H. 248, the question arose whether the failure to use a check list at the election was such a departure from the statute as to avoid the whole balloting, and the court held that the requirement that the check list be used was valid, and any votes cast without its use void.

When the voters in Kenmare presented themselves at the polling places, they were charged with knowledge of the requirements of the law, and that, on observing the failure of the officials to use a registry list, they were only entitled to vote on furnishing the prescribed affidavit showing their qualifications. None of them furnished such affidavits. The primary duty was on the electors; at least had they not failed to comply with the provisions of the law, the present difficulty could not have arisen. The basic fallacy of respondents' claims may be resolved logically, on final analysis, into the position that the possession of the qualifications of an elector entitles one to vote. This is not so. For a discussion of this subject, see Miller v. Schallern, 8 N. D. 395, 79 N. W. 865. It might as well be said that any citizen qualified to take a government homestead may acquire title to one without proving compliance with the law regarding residence and cultivation.

6. The learned trial court was of the opinion that § 2334, Rev. Codes 1905, which provides that no refusal nor neglect on the part of any official to perform his rightful duty in connection with such election shall, in any wise, affect the validity of such election, rendered the failure to have at the polling places and make use of such registry list immaterial. What we have previously said, we think, is a sufficient answer to this suggestion. We cannot believe that it was intended by the enactment of § 2334 to render ineffectual the purpose of the registration law. In our opinion that section is only intended to apply to the minor details of conducting the election, such provisions as are plainly directory and a violation of which constitutes an irregularity only. This enactment is only in conformity with the holdings

of courts of other states in the absence of such a statutory provision, yet they at the same time held that the violation of much less vital requirements constitutes cause for rejecting votes. This section was enacted when questions relating to the division of counties were submitted at special elections, and on argument it is questioned whether it was intended to, and does apply to, general elections, and there is much force in this argument as presented, but it need not be decided. The duty rested upon the voters. It is true that duties also are placed upon the officials. Their responsibility may be said to be divided, but, as said in Miller v. Schallern, supra, "election laws are framed upon the supposition that voters are sufficiently enlightened to know their provisions; nor can such laws be enacted upon the contrary without inviting anarchy and political chaos." In that case the court passed upon another provision of the election law which we think might, with equal force, be contended to be directory, but it held it mandatory. Section 738, Rev. Codes 1905, requires the corrected list of the qualified electors to be carefully kept and preserved for use on election day, and then provides the method for its use. We think it would be fatal to the object of the registration law to apply § 2334 to the provisions of that law and the statutes regarding the conduct of elections which are mandatory. In other words that section does not affect mandatory provisions of the law. We may add that the members of this court, as a body and singly, have carefully considered and discussed every feature of this case with a view to avoiding a seeming injustice to some who may have been qualified electors in fact and law, but have been unable to reach any final and satisfactory decision admitting the counting of any of the votes illegally cast without effecting a total nullification of the registration law and defeating its purpose. These are not times in which the bars should be removed and frauds be permitted to be perpetrated in·elections, regardless of the clear intent of the legislature to prevent them or render it difficult to perpetrate them. The tendency of the best and most recent authorities is toward giving effect to all laws designed to protect the honest exercise of the elective franchise against the frauds of those who may seek to gain by fraudulent practices. Whether or not any such frauds were committed in the case we are considering is immaterial. We do not intimate that any actual fraud was attempted, but we must

construe the statute with reference to facts which may exist elsewhere or arise in the future. Inasmuch as the findings only in this case are before us and they warrant a judgment in behalf of the contestant, the judgment of the District Court is reversed, and it is directed to enter a new judgment in favor of the contestant. The statute requires us to determine this appeal in a summary manner. We have attempted to comply with this requirement in so far as possible, considering the delay occasioned by counsel in the submission of briefs and our other imperative duties. It has been argued and reargued and several briefs submitted, and we feel that no further discussion would shed any light upon the subject, and that, in view of the near approach of the primary election and the few days remaining before candidates must have their names certified to enable the officers to place them upon the primary ballot, and other matters demanding immediate action, the remittitur should be transmitted to the District Court forthwith. All concur.