# STATE ON THE RELATION OF B. W. SHAW, Relator v. HARMON, as County Auditor of Morton County.

### (137 N. W. 427.)

**Sovereignty of state — writ of mandamus — private relator.**

1. Where a question is *publici juris* and directly affects the sovereignty of the state or the franchise rights and prerogatives of its citizens, this court will issue its prerogative writ of mandamus on the relation of a private relator, although the attorney general refuses to make the application or to approve the same.

**Elections — county auditors — instructions to election officers.**

2. Section 621, Revised Codes 1905, requires each county auditor to cause to be printed and furnished to the various election officers cards containing full instructions to electors, etc.

*Held*, that where the statute relative to certain instructions is ambiguous, it is not a compliance with § 621 to print on such cards the mere language of the statute. Such instruction should be sufficiently explicit so as to fully inform the electors of the proper method of preparing their ballots.

**Voters — second choice permissive — validity of votes.**

3. Chapter 212, Laws 1911, is construed, and it is *held* that the provisions

---

Note.—On the question who may be relators in mandamus proceeding in matter of public interest, see notes in 7 Am. St. Rep. 484, and 98 Am. St. Rep. 865. See also note in 105 Am. St. Rep. 122.

23 N. D.—33.

thereof relative to second choice voting are not mandatory, but merely permissive, and that under such act it is wholly optional with the voter whether he shall exercise such right, and a failure to vote for a second choice will not in any way affect the validity of his first choice vote.

Opinion filed July 24, 1912.

Application for a writ of mandamus to compel respondent as county auditor to show cause why a peremptory writ of mandamus should not issue commanding him to amend and correct the instruction cards required by law to be furnished by him to election officers.

Writ granted.

*Palda, Aaker, & Greene,* of Minot, and *B. W. Shaw,* of Mandam, for relator.

No appearance for respondent.

FISK, J.   On the 15th day of June an order was issued by the chief justice requiring respondent, as county auditor of Morton county, to show cause before this court on June 20th, why a peremptory writ of mandamus should not issue commanding him to amend and correct the instruction cards required by law to be furnished by him to the election officers of the several precincts within his county, so as to contain, among other things, the following instruction: "Where there are three or more candidates for the same office, the voter may vote for both first and second choice, but that a failure to vote a second choice will not affect the validity of the ballot for that office."

On the return of such order to show cause there was no appearance on behalf of respondent.   Prior to making such application to this court relator applied to the attorney general to approve the same, which he declined to do, but expressly disapproved such application.   The question involved being one *publici juris,* wherein is directly involved the sovereignty of the state and its prerogatives and the franchise rights of its citizens, it is well settled that this court may, in the exercise of its original jurisdiction, issue the writ prayed for as a prerogative writ on the petition of a private relator, even though the attorney general refuses to make the application or to approve the same.   State ex rel. McDonald v. Holmes, 16 N. D. 457, 114 N. W. 367.   Relator is a candidate for nomination for the office of attorney general of the

state at the ensuing primary election, and he makes this application for himself and for all others similarly situated, and for and on behalf of all electors of the state, and his purpose, in brief, is to obtain from this court a construction of that portion of chapter 212, Session Laws of 1911, relating to the subject of first and second choice voting at primary elections, it being his contention: (1) That the provisions in said act relating to the form of ballots and which provides that "there shall be printed above the names of the candidates for such office the following: Vote for both first and second choice for this office, . . .," is not mandatory; (2) that a failure to vote for second choice does not invalidate the first choice vote for any office.

The attorney general, more than a month prior to his application, having given an official opinion contrary to relator's contention, which opinion has been generally published throughout the state, and there being grave doubts entertained as to whether second choice voting is made compulsory rather than permissive by said act, it is of vital importance to the electorate of the entire state that the question be settled by this court in advance of such primary election, to the end that there may be uniformity of voting, and also to avoid serious complications which might otherwise subsequently arise in counting and canvassing the votes and returns following such state-wide election. As stated by counsel for relator, it is not so important as to what the rule is as it is to have such rule settled in advance of the primary election.

Section 621, Revised Codes 1905, prescribes that "each county auditor shall cause to be printed on cards, in large type, full instructions to electors as to the manner of obtaining and preparing ballots, and also containing a copy of §§ 683, 684, 8614, and 8615. He shall furnish ten such cards to the judges of election in each election precinct, and the judges of election shall at the opening of the polls post at least one of such cards in each booth or compartment provided for the preparation of ballots, and at least three of such cards in and about the polling place," etc. Pursuant to this statutory mandate, respondent had prepared and was about to furnish such cards of instruction to the judges of election in the various precincts of Morton county, containing, among other things, the following: "When there are three or more candidates for the same office vote for both first and second choice, but do not vote for the same candidate for both first and sec-

ond choice." It will be observed that this language is similar to that employed in that portion of the act of 1911 relating to the form of ballot. We quote therefrom the portion to which we refer: "When there are three or more candidates for the same office for United States Senator or any congressional or state office, there shall be printed upon the ballot at the right of the name of each candidate for such office, a square in a column marked 'first choice' and at the right of the 'first choice' column a square in a column marked 'second choice.' There shall be printed above the names of the candidates for such office the following: Vote for both first and second choice for this office." This language is followed a little later on by a printed form of ballot in accordance therewith. If it is a sufficient compliance with the statute for the auditor to prepare such printed cards of instructions in the exact or substantial language of the state (§ 1, chap. 212, supra), prescribing the form of ballots, it would be unnecessary to require the furnishing of such cards at all. Section 621 aforesaid requires a card of "full instructions to electors as to the manner of . . . preparing ballots." Manifestly, in view of the uncertainty of the question, such instructions should be explicit upon the point as to whether it is compulsory upon the voter to express both a first and second choice for officers for which there are three or more candidates. What is here said is for the purpose of answering any contention which may be made that respondent ought not to be compelled by mandamus to set forth in such cards of instructions, anything in addition to the language employed in said statute. However this may be, the crucial question in the case is of such transcendent importance to the electorate of the entire state that a mere technical rule of practice ought not to be permitted to stand in the way of a decision of such question on the merits.

With these preliminary observations, we now proceed to construe chapter 212 in so far as it relates to first and second choice voting.

It is important to notice that this statute nowhere expressly and directly commands the voters to vote for both first and second choice, and unless it can legitimately be said that the legislature, by the indirect method of employing the language, "vote for both first and second choice," in prescribing the form of the official ballots, thereby intended to lay down a positive rule making it compulsory for each voter to express a second choice under the penalty of rendering his first

choice vote a nullity, we are forced to the conclusion that relator's construction of such statute is correct. We cannot believe that the legislature intended to make the voting for second choice compulsory. If such was the intent it could, and no doubt would, have been expressed in unmistakable language. The instruction to the voters directed to be printed on the ballots, "vote for both first and second choice, . . ." if intended to be mandatory and compulsory should have read, "you must vote for both first and second choice." Why should we read into the instruction language making it mandatory or compulsory, rather than language making it permissive and optional? Is it not more reasonable to suppose that the legislature intended this instruction to be interpreted as reading, "you may vote for both first and second choice," than that they intended it to be interpreted, "you must vote for both first and second choice," especially when the legislature has wholly failed in any portion of the statute to declare what shall be the result as to the first choice vote in case a second choice is not exercised? Is it not proper and reasonable to presume that the legislature would have in express language prescribed that the first choice votes should not be counted where there was no second choice vote, if such had been their intention? Section 648, Revised Codes 1905, being a part of the general election law and which is made applicable to primary elections by § 17, chapter 109, Laws of 1907, providing for primary elections, expressly provides the instances in which ballots shall be deemed void and the election officers directed not to count the same; and it seems but reasonable that the legislature would have laid down like rules in case of ballots containing only a first choice vote if it was the intent that such vote should not be counted.

But the history of our primary election law is quite conclusive in supporting the construction contended for by relator. At the time of the enactment of chapter 212 of the Laws of 1911, Washington was the only state, so far as we are aware, requiring compulsory second choice voting; the policy of the other states having primary election laws being to make second choice voting permissive and optional. In the state of Washington it is expressly made compulsory to vote both a first and second choice in certain instances. Section 18 of chapter 209, Laws of 1907 of Washington, being their primary election law, reads as follows: "In all cases where there are four or more candidates

of any political party for one state or congressional position, every elector voting at a primary election held under the terms of this act shall be required to designate one first choice and one second choice for each such position. No voter shall vote for the same person for first choice and second choice, and no voter shall, where there are four or more candidates for such nomination, vote for one person only, either as first or second choice, and no ballot so voted for one person only, for either first or second choice, or for the same person for both first and second choice, shall be considered a complete ballot, but any ballot under said conditions, failing to show both first and second choice of different persons, shall not be considered or counted, for that office."

In the light of this express legislative mandate there can, of course, be no question as to the effect of a failure to vote for second choice, and the case of State ex rel. Duryee v. Howell, 59 Wash. 634, 110 Pac. 543, and other cases decided by that court, can, of course, throw no light upon our statute, which radically differs from the Washington statute in this one respect. It is a significant fact and most persuasive to our minds, that our statute was borrowed from the state of Washington with their § 18, supra, omitted. This is made apparent from a comparison of the two statutes which are identical in many respects. This being true, the conclusion is irresistible that our legislature omitted § 18 of the Washington statute deliberately, and with the intention of not adopting that phase of the Washington law making second choice voting compulsory. No other intent is possible. But even were this not so, and if there were no side lights to aid us in the interpretation of our statute, we still would have no hesitancy in sustaining relator's contention. The most that can be said to the contrary is that the words, "vote for both first and second choice," are mandatory. Conceding, for the sake of argument, the correctness of this interpretation, it by no means follows that a failure to comply with such mandate would have the effect of nullifying the first choice vote. To so hold would be judicial legislation, for it would be reading into the statute something which is not there. When the legislature has studiously refrained from prescribing what the penalty shall be for disregarding such mandate, is it the function of the courts to do so? Most clearly not. The courts are not warranted in assuming, from the language employed, any such legislative intent. But we do not deem the

language in question as employed in the statute, mandatory in the absence of a provision, as in the state of Washington, expressly nullifying a first choice vote where a second choice is not expressed. Of course, as stated in 2 Lewis's Sutherland on Statutory Construction, § 709, "if the statute provides that ballots which fail to conform to certain requirements shall not be counted, the command is imperative," but the general rule, in the absence of such a specific statutory mandate, is that courts will in general so construe election laws as to prevent the disfranchisement of voters by reason of irregularities and omissions of officials, or by reason of a voter's failure to comply strictly with the law in preparing and marking his ballot. Ibid. This author in § 622 of his valuable work also says: "Statutes concerning the manner of conducting elections are directory unless the noncompliance is expressly declared to be fatal to the validity of the election, or will change or make doubtful the result. Provisions requiring ballots to be initialed by the judges of election, to be marked in ink, and to contain the name of the party or principle which the candidate represents, were held directory. But a provision that a ballot not conforming to certain requirements shall not be counted is mandatory." See authorities there cited. The decisions of this court in Miller v. Schallern, 8 N. D. 395, 79 N. D. 865; Lorin v. Seitz, 8 N. D. 404, 79 N. W. 869, and Howser v. Pepper, 8 N. D. 484, 79 N. W. 1018, in so far as this point was passed upon, were bottomed on the express statutory mandate contained in § 684, Revised Codes 1905, providing that any ballot not indorsed by the official stamp and initials shall be void and shall not be counted. The action in question, as we have above stated, contains no such provision with reference to ballots in which only a first choice vote is designated. See also Lankford v. Gebhart, 130 Mo. 621, 51 Am. St. Rep. 585, 32 S. W. 1127, where the court said: "When the statute requires that a ballot, on account of want of conformity to any particular provision of the law, shall not be counted, it is mandatory." It is noticeable that the act in question contains no negative words—an additional reason for inferring the legislative intent to have been that it should be held as merely directory and permissive, and not mandatory and working partial disfranchisement by such a forced construction of a statute of such indefinite and uncertain terms. The words of the act in question, "vote for first and second choice for this office," are not more in the form of a

command and therefore mandatory, than are the words, "vote for three" or "vote for four," which are found toward the end of the statutory ballot. If the former expression is to be construed as mandatory, the latter expressions should receive a like interpretation, yet, we believe, no one will contend that the latter expressions were intended to be other than permissive. The words we refer to are found opposite the offices of commissioners of railroads, justice of the peace, and constable, in the statutory form of ballot.

We are not unmindful of the fact that the supreme court of Idaho in the recent case of Adams v. Lansdon, 18 Idaho, 483, 110 Pac. 280, under a like statutory provision, reached the conclusion that such statute was mandatory, and that a failure to vote for second choice rendered the first choice vote a nullity. In giving his opinion, the attorney general, no doubt, relied on this case. We have carefully read the opinions in such case, and, with due respect for the judgment of that court, we are, for the foregoing reasons, forced to disagree with both the reasoning and conclusion of the court on this point. It is apparent that the construction placed on the Idaho statute by the court did not meet with favor by the people, for, within a few months after such decision was made, the legislature of Idaho amended the law so as to permit optional second choice voting. We held in the recent case of Fitzmaurice v. Willis, 20 N. D. 372, 127 N. W. 95, in an opinion by the present chief justice, that "negative words are generally held to be mandatory," and it was accordingly there held that the words, "no vote shall be received at any election in this state if the name of the person offering such vote is not on the register . . .," were mandatory. But, as we have above stated, no negative words are employed in the act in question relative to first and second choice voting.

The writ will issue as prayed for.

SPALDING, Ch. J., and BRUCE, J., dissent.

BRUCE, J. (dissenting). I can see much force in the argument of the majority opinion in this case. I cannot, however, believe that it rightly construes the statute in question, or the legislative intent which lay behind it. It is to be remembered that, in determining such case, it is

not the intention or understanding of the author of the bill, or of the committee which proposed it, which we must seek to determine, but rather the intention of the legislative body as a whole, which voted upon and approved it. When a statute is taken from another state, the rule is well established that the presumption will be that the construction put by the courts of that state upon it will be followed in the state of its adoption. Our statute was either framed upon that of the state of Washington or that of the state of Idaho, perhaps upon both. It is more like the Idaho statute than that of Washington. The Idaho court construed the statute of that state to be mandatory as to second choice, and construed the words, "vote for first and second choice," as being imperative, not directory. It is true that a later legislature amended the form of the statute, and changed the words, "vote for first and second choice," to, "You may at your option vote for both first and second choice if there are more than twice as many candidates as there are positions." But this is an argument for, rather than against, the presumption that our statute should be construed to be mandatory until so amended. Our legislature, indeed, had before it the acts of both the Idaho and Washington legislature, which were held by the courts of those states to be mandatory, and in addition thereto the magazine articles of many years, all of which had insisted upon the democratic necessity of nomination by a majority vote. The opinion in chief is in error in regard to the passage of the amendment of the Idaho statute. That statute was not amended until after our own legislative session had adjourned. The same conclusion must follow from a consideration of the facts surrounding the Washington decision. At the time of the adoption of the North Dakota statute the Washington court held their statute to be mandatory. It is true, as suggested in the majority opinion, that there was a clause in that statute which also provided that if the voter did not vote for both first and second choice his ballot should be thrown out. The Washington court, however, in holding the words, "vote for both first and second choice," to be mandatory, and not directory, construed these words by themselves alone, and made no reference to, nor paid any attention whatever to, the other clause referred to. .

"But if there were doubt as to the proper construction of other provisions of this act," the Washington court says in State ex rel. Duryee v. Howell, 59 Wash. 634–639, 110 Pac. 543, "that doubt is removed by the

form of ballot which the legislature has itself prescribed in § 4813. The form of ballot there given follows literally the provisions of the section preceding it. It first contains the names of candidates for representatives in Congress; next, the names of candidates for the several state offices, and next, the names of candidates for United States Senators. Above the names of candidates for representatives in Congress and state offices is a warning to the voter to vote for both first and second choice for these offices, while above the names of candidates for United States Senators is a warning to vote for one choice only. To remove any room for doubt, the names of four senatorial candidates are inserted, which would bring the ballot within the second choice provision of the statute if that provision had any application. To avoid the force of this provision the relator contends that legislative forms are only directory, and that a substantial compliance therewith satisfies the requirements of the law. As a rule this contention is sound, but we are not asked to uphold a form of ballot which substantially conforms to the requirements of the law. On the contrary, we are asked to compel a state officer to certify a form of ballot at variance with the form prescribed by the legislature itself. This we must decline to do."

The form of ballot prescribed in Washington was practically the same as ours. Above the names of the candidates were the words, "vote for both first and second choice for this office." The Washington court held that it could not instruct the auditors to prepare a ballot which was contrary to the form of the statute. The relator in this case has asked the court to instruct the auditors that the language of the statute and of the ballots which has been prescribed by the legislature does not mean what it says. See also State ex rel. Zent v. Nichols, 50 Wash. 508, 97 Pac. 728.

When the act in question was passed by the legislature, we must remember that the Idaho and the Washington decisions were in the books and before it. In the Idaho decision of Adams v. Lansdon, 18 Idaho, 483, 110 Pac. 280, the court, on page 492, said: "The language used in said § 14 in regard to voting for a second choice is as follows: 'Vote for both first and second choice if there are more than twice as many candidates as there are positions.' Said language is a command, and indicates a clear intention on the part of the legislature to require the voter as a condition on which he might exercise his first choice, that he

also express his wish as to a second choice in case of the contingency that no first choice selection be made. This is not an unreasonable regulation. In the same section we find the following command: 'Mark only your party ticket.' Is that language directory only? And, again, 'Do not vote for the same person for both first and second choice.' Can anyone reasonably imagine or contend that these provisions are merely directory and may be disregarded by the voter if he desires to disregard them? I think not. Can the voter, under said last-quoted provision, vote for the same person for both first and second choice, and legally insist that his vote be counted? It requires a peculiar temperament to seriously contend that said provisions are merely directory, to be followed or not at the mere whim or caprice of the voter? Those are commands conveyed directly to the voter by being printed at the top of each ballot, and he must obey them, 'or his vote will not be counted for any candidate where a second choice vote is required to be cast. If the legislature had not intended that candidates should be nominated by a majority vote if possible, they certainly would not have injected into said act the provisions for a second choice vote at all. The intention of the legislature which naturally results or is gathered from the context of the act, from the occasion and necessity of the law, from the mischief felt and the remedy in view, is too clear to be misunderstood. Said provision of the statute requiring the voter to vote for both first and second choice where there are more than two candidates for the same position or office is mandatory, and not unreasonable."

It is strange, indeed, that if our legislature did not intend that the words, "vote for both first and second choice," should be mandatory, that they should have adopted the Idaho statute as construed by the decision aforesaid and by the decision of the supreme court of Washington, when, by merely adding the words, "if you desire," or "at your option," they could have made the contrary intention perfectly plain.

Another reason for holding the statute to be mandatory is the history of the legislation, and the political and social thought which led up to it, and the evil which the legislation was intended to obviate. One cannot read the articles and addresses which for the last twenty years have appeared upon the subject in the reviews and magazines of America, without being impressed with the fact that what the proponents of the idea had in mind was a majority vote and the making it impossible for

any candidate to be nominated by less than a majority of his fellow citizens. Its purpose was to prevent "the possibility of a man representing the principles of only one fourth of the voting strength of the party being nominated as the candidate of the party, and in direct conflict with the view of three fourths of the voters of the party. It was the recognition of this principle that caused conventions to nominate by a majority vote of the delegates, instead of by plurality." Chas. K. Lush, in "An Essential Amendment to the Primary Election Law." "The present primary," the same author continues, "is in effect a convention in which every voter is a delegate, and in which the candidate receiving the most votes on the first ballot is the nominee. The remedy lies either in the adoption of the second choice amendment, or by return to the convention system. The present primary law is an absurdity because it applies to the plurality rule to what is, to all intents and purposes, a political convention." "The principal argument against the second choice provision," says Mr. Justice Fullerton in State ex rel. Zent v. Nichols, 50 Wash. 527, 97 Pac. 728, "is that it interferes with the freedom of election guaranteed by the Constitution, and compels the elector to vote for a person other than the candidate of his choice. This contention is untenable. The elector has the utmost freedom of choice in casting his first choice ballot, though his choice will not avail him unless at least 40 per cent of his party agree with him. It was entirely competent for the legislature to provide that a candidate receiving less than 40 per cent of his party vote should not be deemed its nominee, and with such provision in the law it was incumbent on the legislature to provide some other method of nomination whenever a candidate failed to receive the required vote at the primary. It might have provided a second primary, but a second primary would, perhaps, prove equally fruitless unless the number of candidates to be voted for were restricted. If the candidates to be voted for at the second primary were restricted to the two or three receiving the highest vote at the former primary, then all those who did not favor these particular candidates might complain, with equal justice, that they were compelled to vote for candidates other than those of their choice."

Again we find the following in the November, 1909, number of the Political Science Review: "Following our universal practice in regular elections, most of the direct primary laws provide for nomination by

a mere plurality, hence, when there are three, and especially when four or more candidates for nomination, the nominee is frequently chosen by a minority, even a small minority, in direct contravention of the fundamental principle of majority rule. This has given rise to what is generally recognized as a distinct problem in the actual workings of the direct primary system. Thus far only two methods of meeting this problem has been made by our statutes; the second ballot and the minimum percentage plan." We cannot, indeed, but come to the conclusion from reading the literature upon the subject, that it was nomination by majority that was sought to be aimed at. We are also equally as clear that, unless such statutes are construed to be mandatory, there is every opportunity for fraud; the very fraud which the second choice amendment was sought to obviate, and that, in most instances, there will be no second choice at all. The facts of the recent elections in all of the states, indeed, have shown that where the second choice has not been made mandatory, the privilege has not been generally taken advantage of. Each candidate has generally instructed his followers to vote for him and him alone, and not only has the very purpose of the statutes been nullified, but the candidates and voters who have conformed to the spirit of the law have been placed at a disadvantage.

We are cognizant of the fact that the law writers generally state that in the absence of a specific statutory mandate, "the courts will . . . so construe . . . [election] laws as to prevent the disfranchisement of voters by reason of irregularities and omissions of officials, or by reason of a failure of the voter to comply strictly with the law in preparing and marking his ballot." 2 Lewis's Sutherland, Stat. Constr. § 709. We know of no cases, however, where this rule has been applied, where the voters, by their failure or omissions, have nullified the whole purpose of the election laws under which they were acting. There is a wide difference between throwing out a ballot because it is not properly initialed by the judges of election, and throwing out a ballot because the statute has applied to the primary the majority rule of the convention (and after all a primary is merely a statutory political convention), and the voter has refused to abide by that rule. As we said before, the very purpose of the statute and of the second choice idea is to bring about majority nominations, and we are assured that the construction given by the majority of this court will defeat the very purpose for

which the law was enacted. We must take into consideration the evils which the statute sought to prevent, and which led to its enactment, and, in the light of said facts and of the contemporaneous history and decisions, pass upon the legislative intention. This court is not a legislature, nor is it a constitutional convention. It must seek to enforce the laws as they are, and to express the intention of the legislature at the time that it enacts statutes, and not its own ideas, or even a maturer judgment which has later influenced the legislators themselves.

SPALDING, Ch. J. I concur in above.