STATE ex rel. JOHN D. BRADY v. WILLIAM J. BATES.[1]

July 26, 1907.

Nos. 15,103—(25).

**Elections—Candidate's Affidavit of Expenses.**

>   Within the meaning of the corrupt practices act (chapter 277, p. 664, Laws 1895), a political aspirant becomes a candidate at the time of filing his affidavit of intention of becoming a candidate for a specified office, in accordance with section 184, R. L. 1905. The verified statement which he is required by law to file need not include items of expenses incurred or paid anterior to the time of filing such affidavit.

Writ of quo warranto from the supreme court on relation of John D. Brady, to oust William J. Bates from the office of sheriff of St. Louis county because of alleged violations of the corrupt practices act (Laws 1895, p. 664, c. 277). Writ discharged.

This is a proceeding on the part of the relator to oust the respondent from the office of sheriff of St. Louis county because of alleged violations of the corrupt practices act. The alleged misconduct which was charged grew out of the following transactions: In the spring of 1906 the respondent, Bates, then sheriff, one Miles, and one Armstead were conspicuous possibilities for the Republican nomination for the next term as the sheriff of St. Louis county. Miles showed to Bates a letter which he claimed to have received from Armstead. That letter set forth that Armstead had great political strength with respect to the nomination for sheriff in the approaching primary election, that Armstead was not anxious to mix in the fight, and that, if Miles would run, Armstead would stay out and do all he could to help Miles. The result of the interview was an agreement in words and figures as follows:

"Duluth, Minn., March 30, 1906.

"In return for $500.00 (five hundred dollars), one hundred of which has been paid and $400.00 (four hundred dollars) of which is to be paid on or before the last day of filing, I agree to file for the office

[1] Reported in 112 N. W. 1026.

of sheriff of St. Louis before the coming election, and to withdraw from the fight on or before the last day of filing. I do this to keep out any opposition to Mr. Bates, and in order to split up the vote if any other candidate should get into the field.

"[Signed]   Jack Miles."

Respondent, having also signed this contract, paid Miles at the time $75, and afterwards $375 more. Armstead filed April 3 for the nomination for sheriff, Miles on April 2, and respondent on April 18. Bates, having received the highest number of votes in September, was declared the Republican nominee, was elected in November to the said office of sheriff, and received a certificate of election to that effect. Pursuant to section 350, R. L. 1905 (the "Ozmun law" or "corrupt practices act" of 1895), Bates filed his affidavits of expenditures, in which he did not set forth the item of $450 paid to Miles, and in which he swore that his total expenditures made in furtherance of his candidacy amounted to $305. If he was a candidate, within the meaning of the law, when he entered into the agreement with Miles, his expenditures exceeded the amount he was authorized by law to expend.

On this state of facts John D. Brady, relator herein, applied to this court for a writ of quo warranto, upon an information setting forth the foregoing facts, and that he had received the next highest number of votes cast for the office of sheriff, for which Bates had received the highest actual number of votes cast as aforesaid. Thereupon the writ issued, and the matter came duly on for hearing.

*Edward T. Young,* Attorney General, and *Baldwin, Baldwin & Dancer,* for relator.

*H. B. Fryberger,* for respondent.

JAGGARD, J. (after stating the facts as above).

The essential question in this case is whether or not the respondent, Bates, was a candidate for the office of sheriff of St. Louis county at the time at which he entered into the agreement with Miles. If he was then a candidate, within the meaning of the corrupt practices act, he would not be entitled to hold the office, and other questions would be presented. If he was not a candidate at that time, and

was not within the prohibitions or requirements of the corrupt prac-
tices act, then the relator is entitled to no relief.

The corrupt practices act is chapter 277, p. 664, Laws 1895. It
plainly distinguishes between a "candidate for nomination to any elec-
tive office" and a "candidate for any elective office." Section 348,
R. L. 1905, limits and defines the items of authorized and legal ex-
penses of a candidate for nomination. Section 349 prescribes the
limit which candidates for elective offices may respectively expend.
Section 350 requires the filing of affidavits of expenditures by "a
candidate for nomination or election to any elective office." Sec-
tion 379 makes it a misdemeanor on the part of every candidate for
nomination or election to fail to file a verified statement of his ex-
penditures. It is not material here whether, as a result of this verbal
difference, the limitations provided in section 349 upon the expenses
of a candidate for an elective office apply also to a "candidate for
nomination" under section 348; for it must be conceded that, under
either construction, the present incumbent would not be entitled to
hold his office if he was, in a legal sense, a candidate when he entered
into the agreement with Miles. If these were the only statutory
requirements on the subject, the case at bar, apart from the con-
stitutional question, would come within the principle of Leonard v.
Com., 112 Pa. St. 607, 4 Atl. 220. At page 624 of 112 Pa. St. and
page 224 of 4 Atl., Paxson, J., said: "The word 'candidate' in the
constitution is to be understood in its ordinary, popular meaning, as
the people understood it whose votes at the polls gave that instrument
the force and effect of organic law. Webster defines the word to
mean 'one who seeks or aspires to some office or privilege, or who
offers himself for the same.' This is the popular meaning of the
word 'candidate.' It is doubtless the meaning which the members of
the constitutional convention attached to it, and the sense in which
the people regarded it when they came to vote. We therefore say, in
everyday life, that a man is a candidate for an office when he is seek-
ing such office. It is begging the question to say that he is only a
candidate after nomination, for many persons have been elected to
office who were never nominated at all. * * * As before ob-
served, the constitution must be construed liberally, so as to carry

out and not defeat the purpose for which it was adopted. If we give it the narrow construction claimed for it, a candidate for office might resort to all manner of bribery and fraud in procuring his nomination, yet, if he conduct himself properly after his nomination, he could wholly evade the constitutional prohibition."

While it is clear, however, that a man may be and usually is a candidate long before he is, and although he may never be, a nominee, the time is wholly uncertain when he becomes a candidate, in the absence of statutory determination of such time. He may in his own mind be in that venturesome state for many years before any one else is apprised of such intention, and in such case his ambition would not make him a candidate. Nor does he become such if he merely counsel with his friends on the subject. His candidacy must be manifested by some act of his own, the gist of which is that he holds himself out as a candidate. Very often he crosses the Rubicon when he publishes his formal announcement in the local press, or to an organization, or in any public manner. This, however, is not ordinarily necessary. He may become a candidate by soliciting votes, without any declaration. Combe v. Pitt, 5 Geo. III, 1 Black, 523; 1 Hawk. P. C. 315, note 4. A man may be elected to a public office without ever having been a candidate in the legal sense. In Morris v. Burdett, 2 M. & S. 212, the mere fact that a poll was going on and votes sought or given for defendant was held not to have made him a candidate. Having taken no part, directly or indirectly, and not having, by himself or by any other, held himself out as a candidate, it was held that he could take his place in the House of Commons without being charged under the statute with the expenses of the hustings. Bayle, J., defined a candidate as a person desirous of obtaining the suffrages of the electors, and who holds himself out as such. See, however, Regina v. Chisholm, 5 Ont. Pr. 328. It is apparent, in the nature of things, as it is a familiar experience, that, in the absence of statutory prescription on the subject, the time when a man becomes a candidate is extremely vague and indefinite.

The consequences of the violation of the corrupt practices act are serious, both in respect to the individual candidate, who may be punished, and to the public, whose expressed wish may be defeated. It

is important, as a matter of public policy, that its salutary provisions. should be enforced. It is essential to its successful administration that the time at which its provisions go into effect should be definitely determined. In view of the indefiniteness as to such time under the ordinary convention system of nominations, the legislature may reasonably be regarded as having intended to remedy this defect when it legislated on the subject of direct primaries. "The words 'primary election,' we may say, are as well understood to mean the act of choosing candidates by the respective political parties to fill the various offices." Olds, J., in State v. Hirsch, 125 Ind. 207, 24 N. E. 1062, 9 L. R. A. 170. The statutory provisions on "nomination by direct vote" are sections 181–203, inclusive, R. L. 1905. They provide distinctly for the election of party nominees, and prescribe the means by which the candidates for office of the various political parties are selected. They do not, however, purport to "prevent the nomination of candidates by groups, individuals, or so-called political parties, which cannot be recognized as such by certificate of voters to the number hereinafter specified." The law clearly defines who is a candidate under its terms, and how and the time at which an aspirant becomes a candidate. Section 184 provides that at least twenty days before a primary election any person eligible becomes a candidate by, and at the time of, filing his affidavit with a specified official, setting forth, inter alia, the office for which he desires to become a candidate. Upon the filing of this affidavit, and the payment of the required fee, "the auditor shall place such name upon the primary election ballot of the party designated." The election law throughout, in all its sections, treats him as the only candidate with which it has to do. This is literally a statutory definition of "a candidate for nomination to any elective office," within the meaning of the sections of the corrupt practices act previously referred to. There is an essential identity of phraseology. The corrupt practices act provides certain punishment for a "candidate for nomination." The direct primary law defines who is a "candidate for nomination."

A party officeholder, under the ordinary electoral system, passes through two preliminary stages: (1) Where he is a candidate for nomination by his party at a convention. (2) Where he has become

his party's nominee and is a candidate for election. A party office-holder, under the direct primary system, passes through two similar preliminary stages: (1) Where, having filed his affidavit, he becomes a candidate for nomination by his party at a primary election. (2) Where he has been elected as his party's nominee and is a candidate for election. In the case of the nominee of a convention, the candidate files a list of his expenses, beginning with a date which the law does not fix, but which is determined in accordance with its general rules. It is apparently left to the candidate to fix that date in good faith, and perhaps at his peril. In case of a nomination by direct primary election, the statute definitely prescribes the time, viz., when the eligible person files the affidavit of his intention. As to expenses after that date, he must file a verified statement, but as to those which were incurred before it he is not required so to do. Suppose an office seeker spends money with the intention of becoming a candidate for nomination at the approaching primary election, but changes his mind and does not file. Must he make a verified statement of his expenses? Failing to do this, is he liable to prosecution for a misdemeanor? Clearly not. No more was the respondent required to make the statement of his expenditures anterior to the time at which he filed his affidavit and thus became a candidate.

This construction is subject to the objection that it might enable the office seeker to expend large sums of money to help him secure a nomination, and, by filing as late as the law allows, to escape its penalties, and, in effect, to evade its provisions. The time of filing is, however, so long before the primary election, and that time so long before the actual election, as to make that evil seem remote. In ordinary experience, it is likely to occur that the advantage of publicity secured by filing early will overcome any disposition to delay filing with a view to reducing the expense to be reported, and candidates will continue to regulate their filings with reference to considerations of general expediency. However this may be, it is for the legislature, and not for the courts, to remedy the imperfections which may arise in the administration of the law. We have to deal with it as it has been enacted. As enacted, we think that the candidate for nomination upon whom are imposed penalties by the corrupt practices

act is, under the direct primary election law, a person who has filed his affidavit of intention, and has thereby become a candidate for nomination under its terms. Before he becomes such candidate, he is not within the provisions of the corrupt practices act.

Little light is shed on this subject by the authorities. See 6 Cyc. 345; 15 Cyc. 333. State v. Bland, 144 Mo. 534, 46 S. W. 440, 41 L. R. A. 297, to which respondent cites us, has little relevancy to the subject under discussion.

In the case at bar it is not material whether the respondent was trapped into the arrangement, or whether he sought to rescind, and unsuccessfully attempted to stop the check he had given before it was cashed. He was not a candidate until he filed. What he spent before that time is a matter with which the law, so far as this proceeding is involved, has no concern.

In view of this conclusion, it becomes unnecessary to consider here questions as to the constitutionality of the law in question.

The writ is discharged, and respondent allowed to retain the office of sheriff of St. Louis county, to which he has been duly elected and qualified.

START, C. J.

I concur in the result, on the ground that so much of the corrupt practices act (sections 348–354, R. L. 1905) which provides in effect that no person shall be permitted to hold any elective office procured, with his knowledge, connivance, or consent, in violation of any of the provisions of the act, and that all votes cast for him at the election shall be void, and the office awarded to the candidate receiving the next highest number of votes for the same office, is unconstitutional, because it attempts to render a candidate ineligible to hold office who is eligible by virtue of the constitution of the state.

I am not disposed to blink the sin of corruption in election contests, or to minimize its dire consequences to the state; for he who corrupts the electorate betrays the state, and is guilty of a crime akin to treason. If, therefore, the provisions of our statute here under consideration are constitutional, they should be vigorously enforced, to the end that no man may be rewarded with the honors and emoluments of an office which he has secured by corruption.

The power of the legislature to make corrupt practices in elections a felony, instead of a mere misdemeanor as it has done, is unquestioned. If a violation of the act had been made a felony, then any person convicted of the offense, until restored to civil rights, would not be entitled to vote or to hold any office. Const. art. 7, § 2. The legislature, however, has no power to impose disabilities upon any elector, or add to or take away his qualifications for eligibility to an elective office as prescribed by the constitution. State v. Clough, 23 Minn. 17; State v. Holman, 58 Minn. 219, 59 N. W. 1006.

Section 7, article 7, of our state constitution, provides: "Every person who by the provisions of this article shall be entitled to vote at any election shall be eligible to any office which now is, or hereafter shall be, elective by the people in the district wherein he shall have resided thirty days previous to such election, except as otherwise provided in this constitution, or the constitution and laws of the United States." It is not otherwise provided in the constitution as to the office of sheriff, and the respondent, being an elector of the state and entitled to vote, was by virtue of the constitution eligible to be elected to and to hold the office of sheriff. If after he took possession of the office he was convicted of a felony, or was guilty of malfeasance in office, as defined by the statute, he might be removed therefrom, and the office filled by appointment until his successor was elected and qualified. The provisions of the statute here in question, however, do not provide for the removal of a person from office by reason of his conviction of a felony, or on account of any act done or omitted by him while in office. On the contrary, it attempts to make the proof of an act done or omitted by an elector before his election to an office and before his conviction thereof operate by relation so as to render him not only ineligible to the office at the time of the election, but also to render every ballot cast for him void when cast. That such is the effect of the statute is apparent from an examination of its provisions. Sections 348 and 349 thereof forbid any candidate for nomination to any elective office or a candidate for any elective office to pay or promise to pay more than the amount therein limited in furtherance of his nomination or candidacy. Section 350 provides that every candidate shall file, within thirty days after the

election, his verified statement of each and every sum of money contributed, paid, disbursed, or promised by him or on his behalf to secure his nomination or election. Section 351 declares that no person shall be permitted to hold any elective office procured, with his knowledge, connivance, or consent, in violation of any of the provisions of sections 348–350; that is, a candidate and elector who fails to include in his verified statement any item of election expenses, however small in amount, is disqualified from holding the office. Sections 353 and 354 require the court, upon proof of such failure, or of any other violation of the statute, not only to oust the incumbent from office, but to award it to the candidate receiving the next highest number of votes.

Counsel for relator concede that, if these provisions of the statute must be construed as rendering an elector ineligible to an elective office, it is unconstitutional; but they contend that the statute is simply a regulation of the exercise of the right to hold office. If such be the effect of the statute, it is constitutional; for the legislature may reasonably regulate the exercise of the constitutional right to vote and to hold office. The decisions of this and other courts sustaining the validity of registration, primary, and Australian ballot laws rest upon the basis that they are reasonable regulations of the right to vote; but all of them agree that any regulations which so burden and restrict the exercise of the constitutional right to vote and to hold office as to amount to a practical denial of the right are void.

The case of State v. Moore, 87 Minn. 308, 92 N. W. 4, 59 L. R. A. 447, 94 Am. St. 702, relied upon by the relator, is an illustration of what is, perhaps, the limit of the right of the legislature to regulate the right of an elector to be elected to office. The decision, however, is not here in point; for its very basis was that the regulation under consideration did not affect the elector's eligibility, for the reason that the blank space required to be left on all official ballots enabled him to aspire to the office and invite his fellow citizens to vote for him by writing his name in the blank spaces on the ballots. Nor are decisions in point which are based upon the British corrupt practices act, enacted by a parliament whose powers are not limited by a written constitution, or upon similar statutes enacted by the respective

legislatures of Pennsylvania, Kansas, and other states, whose constitutions contain express provisions to the effect that corrupt practices in elections by a candidate shall work a forfeiture of his right to hold the office.

The right of a qualified elector to vote and to be eligible to any elective office is guarantied by the constitution. Nevertheless the legislature may regulate the right. It may declare that a vote secured by bribery is void, and provide that any person securing an office by bribery may be ousted therefrom, or declare what acts and omissions in office shall constitute malfeasance in office and provide for the removal of the incumbent, or provide for his removal upon his conviction of a felony committed before or after his election, for thereby he forfeits all civil rights by virtue of the constitution, or to require him to give bond for the faithful performance of his official duties. It cannot, however, deprive him of his vote, or render him ineligible to hold an elective office, if he is entitled to vote and to hold the office by the provisions of the constitution. Our corrupt practices act cannot, in my opinion, reasonably be construed simply as a regulation of the right to hold office, but, on the contrary, its clear import is to the effect as already stated; that is, it is an attempt to render an elector who is a candidate for office ineligible if he fails to include in his verified statement of election expenses each and every item paid, disbursed, or promised. Were the construction of this statute otherwise doubtful, its meaning is made perfectly clear by section 354, the legal effect of which is to render every ballot cast for a candidate who has violated any of the provisions of the act, however slight, absolutely void, for the reason that the mere fact of such violation renders him ineligible. This is necessarily the construction to be given to this section, for otherwise the candidate receiving the next highest number of votes—that is, less than a plurality—could not be declared elected and awarded the office. Barnum v. Gilman, 27 Minn. 466, 8 N. W. 375, 38 Am. 304.

BROWN, J.

I concur in the views expressed by the Chief Justice.