(August 11, 1910.)

## GARDNER G. ADAMS, Plaintiff, v. ROBERT LANSDON, as Secretary of State of the State of Idaho, Defendant.

[110 Pac. 280.]

PRIMARY ELECTION LAW—CONSTITUTIONALITY OF—LEGISLATIVE INTENT —MANDATORY PROVISIONS — STATUTORY CONSTRUCTION — EXPENDITURES OF CANDIDATES—PROVISIONS OF LAW CONSTRUED TOGETHER— WHEN A PERSON IS A CANDIDATE—PRECINCT OFFICERS.

(Syllabus by the court.)

1. That provision of section 14 of an act entitled, "An act relating to and providing for the nomination of candidates of political parties," etc., and commonly known as the primary election law (Sess. Laws 1909, p. 196), which requires a voter to vote for both first and second choice if there are more than twice as many candidates as there are positions or offices to be filled, is not in conflict with sec. 19, art. 1, of the constitution, which provides that "No power, civil or military, shall at any time interfere with or prevent the free and lawful exercise of the right of suffrage."

2. Sec. 19, art. 1, of the constitution has reference to the attendance of officers, civil or military, at the polls, and prohibits them from interfering with the free and lawful exercise of the right of suffrage.

3. By the provisions of said act, the legislative intent was to take the nomination of the officers therein named away from party committees or party conventions and have them nominated by the legal voters of the several political parties by a majority of the first-choice votes if possible, and in case no candidate receives a majority of first-choice votes, then by a plurality of first and second-choice votes added together.

4. That provision of sec. 14 of said act which reads as follows: "Vote for both first and second choice if there are more than twice as many candidates as there are positions," is mandatory.

5. The failure to vote for both a first and second choice will not avoid the ballot except as to the particular office where both a first and second choice vote is required and for which the voter has failed to express both a first and second choice.

6. The provisions of the primary election law in regard to personal expenditures of candidates to aid or promote their nomination are not repugnant to the provisions of sec. 9, art. 1, constitution of Idaho, which declares that "Every person may freely speak, write

and publish on all subjects, being responsible for the abuse of that liberty."

7. The intent and purpose of said primary election law is to prevent large expenditures of money, property or promises to aid or promote the nomination of any person.

8. Under the provisions of sec. 24 of said law, a candidate for nomination is prohibited from expending for "personal expenses" as the same is defined by said section, "or at all," to aid or promote his nomination, more than fifteen per cent of the yearly compensation or salary attached to the office which he seeks.

9. All of the provisions of said act in regard to the nomination of a candidate by payment of a fee or by petition and also the provisions in regard to personal expenses must be construed together, and the candidate is prohibited from expending for all such purposes more than fifteen per cent of the yearly salary of the office he is seeking.

10. A person is a candidate for nomination within the intent of the primary election law when he is expending his money in employing and sending out workers or perfecting an organization, or advertising and exploiting himself, or influencing public opinion in his favor or against an opponent, or in numerous other ways that present themselves to the office-seeker for the purpose of increasing and enhancing his ultimate chances of nomination for a given office or to aid or promote such nomination.

11. Under the direct primary law the *purpose* of the expenditure by a candidate is the test of its lawfulness without reference to the time at which it was made.

12. Precinct officers may, under the provisions of sec. 29 of said act, be nominated in any reasonable way provided by a party committee or organization.

13. Laws are enacted to be read and obeyed by the people, and in order to reach a reasonable and sensible construction thereof, words that are in common use among the people should be given the same meaning in the statute as they have among the great mass of the people who are expected to read, obey and uphold them.

This is an original proceeding for a writ of prohibition to restrain the secretary of state from certifying to the several county auditors of the state a list containing the names, post-office address and party designation, etc., of candidates as required by the primary election law. Peremptory writ *denied* and proceeding dismissed.

Hawley, Puckett & Hawley, Karl Paine, and Good & Adams, for Petitioner.

The provision in sec. 14 of the act, ''Vote for both first and second choice if there are more than twice as many candidates as there are positions,'' is ambiguous and uncertain. If it was intended to be a mandatory provision compelling the voter to vote for first and second choice as to candidates for a particular office, then it is unconstitutional, in that it violates the provisions of sec. 15, art. 1 of the constitution.

This constitutional provision applies to primary as well as general elections. A statute may be within the inhibitions of the constitution as well by implication as by expression. (*Evansville v. State,* 118 Ind. 426, 21 N. E. 267, 4 L. R. A. 93; *Page v. Allen,* 58 Pa. 338, 98 Am. Dec. 271.) This statute by implication interferes with the free exercise of the right of suffrage.

*State v. Nichols,* 50 Wash. 508, 97 Pac. 728, is the only case of which we have knowledge that passes upon a similar question, but we hold that it is not in point so far as our contention here is concerned. The legislature of our state in passing our primary election law followed the law of the state of Washington closely, but eliminated the mandatory provisions with reference to first and second choice. If it had been the intention of the legislature to compel the elector to vote for both first and second choice, why was it the Washington law was not followed in this regard? Does not such provision in the Washington law so eliminated from the Idaho law of itself and in itself prove that it was the intention of the legislature to leave it optional with the voter whether he cast his ballot for first choice only, or for both first and second choice?

D. C. McDougall, Attorney General, J. H. Peterson, and O. M. Van Duyn, for Defendant.

While there is no express statutory demand in the law, requiring the voter to vote for a second choice, and providing that if he does not the ballot shall not be counted, yet there

is by clear and strong implication an intent of the legislature revealed that it is the duty of the voter to vote both a first and second choice. We find this intent revealed by that part of section 14 which provides for the form of ballot and instructions thereon, and by an absolute lack of any provision whatsoever in the primary law providing for the making of any nomination, either by convention or by another primary election, should the first primary election by any means at all fail to result in a nomination.

The preferential system arose from a desire on the part of the legislature to avoid the expense and inconvenience of two elections. Therefore, it was sought to bring about this result by requiring the people to decide between a first and second choice, providing that if a majority of the first choice votes were not had, that a plurality of first and second choice would prevail. The legislature must have had two objects—first, putting into the hands of the greatest number of people the nominations of the officers; second, to prevent another election being had by requiring first and second choices to be made. In construing the law, then, we must construe it in the light of the evident purpose that the legislature had in view. The intent of a statute is the law. (2 Sutherland on Stat. Const., 2d ed., secs. 363, 366, 368–370.)

"The provision of the statute governing the conduct of elections is mandatory, when the purpose of the law-making power will be plainly defeated if its command to do acts in a particular way did not imply a prohibition to do them in any other way." (*Perry v. Hackey*, 11 N. D. 148, 90 N. W. 483; 7 Dec. Dig., sec. 227.)

When the disregard of a statutory provision would work the ruin of a law, the provision must be regarded as mandatory and followed. It is reasonable to believe that a disregard of said mandatory provision of preferential voting would necessarily result in a rejection of the ballot so voted. (Beal on Rules of L. Int., pp. 331, 434; 26 Am. & Eng. Ency. of Law, 613.)

We think the intent of the law is plain that the expenses shall be calculated from the time of filing of the acceptance

·of the nomination. (*State v. Bates,* 102 Minn. 104, 112 N. W. 1026, 12 Ann. Cas. 105.) This case is in point, as it is based upon a statute almost identically the same as the Idaho ·statute. To hold otherwise than is laid down in the rule of *State v. Bates* would bring about a great uncertainty and would be productive of ill-results, and following the said case would make our statute most uncertain, indefinite and ambiguous and most difficult of enforcement.

O. E. McCutcheon, *amicus curiae.*

Our law is different from the Washington law in using mandatory words addressed directly to the voter in the second person, and this tends to add strength to its commands. (*State v. Connor,* 86 Tex. 133, 23 S. W. 1103, at 1107; 3 Words and Phrases, 2079.)

The command is, "Vote for both a first and second choice." Is there any doubt or room for construction here? Let us look at the other commands of the law. The first is, "Mark only your party ticket." Again it is commanded, "Do not vote for the same person for both first and second choice."

It is true that election laws are liberally construed in favor of the voter, so that his vote may be saved if possible, and that doctrine should apply to the primary law. But liberal construction is for the benefit of the willing and obedient; the voter who honestly tries to obey the law, but does so imperfectly; not for the unwilling and disobedient; the voter who, knowing the law, undertakes to defy it.

The vague suggestion that it somehow infringes upon the right of voters to free suffrage under sec. 19 of our Bill of Rights is altogether visionary. The same argument, in substance, has been made against every legislative act in the history of suffrage regulation, commencing with registration laws, back at least in the '50's and from thence on down through the category. This sec. 19, uses the words "interfere" and "prevent" and evidently refers to officers, civil or military, being about the polls to meddle with or intimidate electors. But however that may be, our constitution, unlike that, I think, of any other state, expressly confers upon the

legislature power to enact laws on the subject under consideration. (Art. 6, sec. 4.)

As to the mathematical problems and the supposed ambiguities arising from the words "more than twice," etc., as complained of by counsel, sec. 413 of the code makes ample provisions for sample ballots for the instruction of voters. "Voting Schools" have been quite common ever since the advent of the Australian ballot.

In my opinion, by those members of the legislature who considered well the language written into this law, this second choice provision was deliberately adopted for the very purpose of necessitating the naming of the proper candidates by a single primary, and to prevent the obvious abuses by which the election might be made fruitless, were this provision omitted.

SULLIVAN, C. J.—This is an original proceeding brought by the plaintiff for a writ of prohibition to prohibit and restrain the defendant, who is secretary of state, from certifying to the several county auditors of the state a list containing the names, postoffice address and party designation of the persons whose nomination papers have been filed with the defendant as secretary of state to be voted for at the primary election to be held August 30, 1910. A general demurrer to the complaint was filed and the case was heard upon the demurrer.

The plaintiff contends that the law commonly known as the primary election law (Sess. Laws 1909, p. 196) in several of its sections is unconstitutional, and that it is so ambiguous and unintelligible as to make it unenforceable and for that reason is void; (2) that the provision of sec. 14 of said law, whereby it is attempted to compel a voter to vote for a first and second choice, is in violation of art. 1, sec. 19, of the constitution of the state of Idaho, which guarantees to every citizen free and lawful exercise of the right of suffrage; (3) that said primary election law is violative of the right of free speech as guaranteed by sec. 9 of art. 1 of the constitution of the state of Idaho, in that it restricts and limits the

cost of traveling expenses and advertisement; and (4) that the provisions in regard to expenditures other than personal expenses at the commencement of the campaign are ambiguous, unintelligible and for that reason unenforceable; and (5) that it fails to provide for the nomination of precinct officers.

### First and Second Choice, Constitutional.

The first contention of plaintiff goes to the provision of that part of sec. 14 of said primary election law that requires the voter to vote for a first and second choice, where there are more than two candidates for the same office, and refers to the instructions to be printed at the top of the ballot which are as follows: "Instruction: Mark only your party ticket. Vote for both first and second choice if there are more than twice as many candidates as there are positions." It is first contended that if said provision requiring the voter to vote for a second choice were intended to be mandatory it violates the provisions of sec. 19, art. 1 of the constitution of Idaho, which section is as follows: "No power, civil or military, shall at any time interfere with or prevent the free and lawful exercise of the right of suffrage."

It is argued that to compel a voter to vote for a second choice, when there are more than two candidates for the same office—particularly when he has no second choice—would be violative of said provisions of the constitution, in that it would interfere with or prevent the free and lawful exercise of the right of such voter and compel him to vote for a second choice candidate when he did not wish to do so.

It has been well settled by a long line of decisions that the legislature has the power to make at least reasonable regulations in regard to the conduct of elections and the exercise of the right of suffrage. Under the contention of counsel the question arises whether said second choice provision unreasonably interferes with the freedom of the elector in exercising that right. This contention is fully answered by the supreme court of Washington in the case of *State v. Nichols,* 50 Wash. 508, 97 Pac. 728. The court there had under consideration the primary election law of the state of Washing-

ton, and in that case the same contention was made as the one here under consideration, and the court said: "The elector has the utmost freedom of choice in casting his first-choice ballot, though his choice will not avail him unless at least forty per centum of his party agree with him. It was entirely competent for the legislature to provide that a candidate receiving less than forty per centum of his party vote should not be deemed its nominee, and with such a provision in the law it was incumbent on the legislature to provide some other method of nomination whenever a candidate failed to receive the required vote at the primary. It might have provided a second primary, but a second primary would perhaps prove equally fruitless, unless the number of candidates to be voted for were restricted. If the candidates to be voted for at the second primary were restricted to the two or three receiving the highest vote at the former primary, then all those who did not favor these particular candidates might complain with equal justice that they were compelled to vote for candidates other than those of their choice. So long as voting is by ballot, an official ballot is a convenience, if not a necessity, and some authority vested somewhere in government must determine the names which shall appear on that ballot, and those names must necessarily be few in number; and, we repeat, any reasonable method prescribed by the law-making power which accomplishes this result must be sustained by the judicial department of government. The courts have no concern with its wisdom or policy."

After a careful consideration of this question we conclude that said provision of the primary election law is not in conflict with said provision of the constitution and does not abridge the freedom of the voter or interfere with his right of suffrage. The enactment of said provision was a reasonable exercise of the power of the legislature in said matter, and not in conflict with any rights guaranteed an elector by said provisions of the constitution. However, we think counsel misapprehends the force and effect of said constitutional provision. It is therein declared that no power, civil or military, shall at any time interfere with or prevent the free and

lawful exercise of the right of suffrage. Those provisions evidently refer to officers, civil or military, being about the polls to meddle with or intimidate electors, and thus to interfere with and prevent them from the free and lawful exercise of the right of suffrage.

### First and Second Choice—Mandatory.

Sec. 34 of said act provides as follows: "The person receiving a majority of the first choice votes at a primary as the candidate of a party for an office, shall be the candidate of that party for such office, and his name as such candidate shall be placed on the official ballot at the following election: *Provided*, That if no candidate shall receive a majority of the first choice votes, then in that event a canvass shall be made of the second choice votes received by the candidates for said office, and said second choice votes shall be added to the first choice votes received by each candidate for such office, and the candidate receiving the highest number of first and second choice votes shall be the nominee for such office of the party nominating him."

It will be observed from the provisions of said section that where there are more than two candidates for the same office, the candidate receiving a majority of the first choice votes is elected as such candidate, but in case neither of the candidates receives a majority of the first choice votes, then the second choice votes of each candidate must be added to his first choice votes, and the one then having the highest number of first and second choice votes is declared elected as the nominee for such office whether he has a majority of the votes cast or not. The legislative intention is clearly apparent from those provisions that if possible each nominee should be selected by a majority vote, first by a majority of the first choice votes, and if that could not be done, then by a majority of the first and second choice votes added together; but in case that no candidate had a majority of the first choice votes or a majority of the first and second choice votes added together, then the candidate receiving a plurality of the first and second choice votes should be the nominee.

The clear intention of the legislature in enacting said primary election law was to take the matter out of the hands of party committees and conventions and place it in the hands of the voter and secure, if possible, an election by a majority vote, and if neithér candidate should receive a majority of the votes cast, then the first and second choice votes should be added together, the one receiving the largest number to be selected as the candidate. In other words, it is apparent that the intention was to secure an election by a majority vote if possible, but in case no candidate should receive a majority of the first choice votes or a majority of the first and second choice votes added together, then, in order to prevent the nomination by a party committee or convention, it was provided that the candidate receiving the largest number or a plurality of the first and second choice votes should be elected, and thus preventing any possibility of a failure on the part of the people themselves to select a candidate.

A construction of said act that might result in taking the nomination of many of the officers away from the electors and place it in the hands of party committees and conventions would be contrary to the legislative intent; and in construing the provisions of said primary election law we have in mind the well-settled rules of statutory construction, one of which is very tersely stated in 2 Lewis' Sutherland on Stat. Const., 2d ed., sec. 363, as follows: "Intent is the spirit which gives life to a legislative enactment. In construing statutes the proper course is to start out and follow the true intent of the legislature, and to adopt that sense which harmonizes best with the context and promotes in the fullest manner the apparent policy and objects of the legislature." It is said by the same author at sec. 370 as follows: "When the words are not explicit, the intention is to be collected from the context; from the occasion and necessity of the law; from the mischief felt and the remedy in view, and the intention is to be taken or presumed according to what is consonant with reason and good discretion."

The language used in said section 14 in regard to voting for a second choice is as follows: "Vote for both first and

second choice if there are more than twice as many candidates as there are positions.'' Said language is a command, and indicates a clear intention on the part of the legislature to require the voter, as a condition on which he might exercise his first choice, that he also express his wish as to a second choice in case of the contingency that no first choice selection be made. This is not an unreasonable regulation.

In the same section we find the following command: ''Mark only your party ticket.'' Is that language directory only? And again, ''Do not vote for the same person for both first and second choice.'' Can anyone reasonably imagine or contend that those provisions are merely directory and may be disregarded by the voter if he desires to disregard them? I think not. Can the voter under said last-quoted provision vote for the same person for both first and second choice and legally insist that his vote be counted? It requires a peculiar temperament to seriously contend that said provisions are merely directory, to be followed or not at the mere whim or caprice of the voter. Those are commands conveyed directly to the voter by being printed at the top of each ballot, and he must obey them or his vote will not be counted for any candidate where a second choice vote is required to be cast. If the legislature had not intended that candidates should be nominated by a majority vote if possible, they certainly would not have injected into said act the provisions for a second choice vote at all. The intention of the legislature which naturally results or is gathered from the context of the act, from the occasion and necessity of the law, from the mischief felt and the remedy in view, is too clear to be misunderstood. Said provision of the statute requiring the voter to vote for both a first and second choice, where there are more than two candidates for the same position or office, is mandatory and not unreasonable.

The language used in that part of sec. 14 last above quoted, wherein it provides that the elector must vote for both first and second choice, is as follows: ''Vote for both a first and second choice if there are more than twice as many candidates as there are positions.'' The legislature evidently had in

mind that there would often be more than two candidates for the same office, such as governor, lieutenant-governor, sec-- retary of state, etc. They no doubt also had in mind that in the same election there might be more than one congressman. to be elected or more than one justice of the supreme court, and in county matters more than one representative from the same county. For instance, some of the counties have three or more representatives. In that case there is more than one position to be filled in the office of representative, and if there are three representatives to be elected and more than six can- didates to fill those three positions, the elector must vote for both a first and second choice; but if there were only six can-- didates to fill the three positions, the voter would not be re- quired to vote for a second choice, as no second choice votes. need be cast where there are not more than twice as many candidates as there are positions to fill. So it is clear that. under said provision the voter is not required to cast a second' choice vote unless there are more than twice as many candi-- dates as there are positions to fill; or in other words, more than twice as many candidates for the same position as there are selections to be made for that office.

We are also satisfied that it was the purpose of the legis-- lature to require the voter to vote for both a first and second' choice candidate in order that his ballot may be complete and' his intention clear as to his choice of candidates for that par-- ticular office. Of course a failure to vote for either a first or second choice candidate for any one office, where such is required, would not affect or avoid the ballot except as to that particular office. We therefore conclude that said pro-- vision of the law is mandatory, and that a voter must vote for both a first and second choice candidate if there are more-- than twice as many candidates as there are positions or offices. to be filled.

### Expenditures of Candidates.

It is next contended that the provisions of said act in regard'. to expenditures, other than for personal expenses, are ambigu- ous, unintelligible, and for that reason unenforceable. Sec. 24 of said act is as follows: ''No person shall, in order to

aid or promote his own nomination to an office under the
provisions of this law, directly or indirectly, himself or-
through any other person, give, pay, expend or contribute,
promise to give, pay, expend or contribute any money or·
other valuable thing or service, except for personal expenses.
The words, 'Personal Expenses,' as used in this law shall
include only expenses directly incurred and paid by a candi-
date for traveling and for purposes properly incidental to .
traveling, and for writing, printing and preparing for trans- .
mission any letter, circular or other publication, not issued
at regular intervals, whereby he states his position or views .
upon public or other questions, for stationery and postage,
and for the necessary expenses in hiring halls, or other room
for the purpose of holding public meetings to address the ·
voters and others upon public questions and matters relating ·
to his candidacy: *Provided,* that no candidate for nomination
to any office at any primary held under the provisions of this .
act shall expend for personal expense or at all in order to aid
or promote his own nomination to such office, more than fif-
teen per cent of the yearly compensation or salary attached
to such office." And sec. 25 is as follows: "Every candidate ·
for nomination under the terms of this act, or any amend-
ment thereto shall not more than ten days after the day of ·
holding the primary election at which he is a candidate, file
an itemized statement in writing duly sworn to as to its cor- .
rectness, with the officer with whom his declaration of candi- .
dacy or other nomination paper is filed, setting forth each
sum of money and thing of value or any consideration what-
ever, contributed, paid or promised by him or anyone for··
him, with his knowledge or acquiescence for the purpose of ·
securing or influencing or in any way affecting his nomination
to said office. Said statement to set forth sums paid as per-
sonal expenses, and stating fully the nature, kind and
character of the expenses for which the sums were expended
separately and the party or parties to whom the sums were ·
paid and the purpose for which such payments were made; .
and in this statement all sums or other considerations promised
and not paid shall be included. Such statements when so filed .

shall immediately be subject to the inspection and examination of any elector and shall be and become a part of the public records.''

It is contended that the definition of personal expenses in said sec. 24 forbids a person from expending more than fifteen per cent of the yearly compensation or salary of the office for which he is an aspirant. It is argued that said provisions are contrary to the provisions of sec. 9 of art. 1 of our state constitution which is as follows: ''Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty.'' There is nothing in that contention.

The provisions of the primary election law in regard to the expenditures of a person in aiding or promoting his nomination for an office in no manner conflict with said provision of the constitution. That law does not attempt to prevent a candidate from freely speaking, writing and publishing his views on all subjects.

It is also argued that said act is ambiguous in that it does not define when the expenses of a candidate begin, whether after acceptance of the nomination or before, and counsel contend that the expenses of a candidate, for which he is required to file an itemized statement under said act, do not begin until the candidate has filed his nomination paper with the proper officer or until after he has filed his acceptance of such nomination. Counsel cite *State ex rel. Brady v. Bates*, 102 Minn. 104, 112 N. W. 1026, 12 Ann. Cas. 105. That was a proceeding brought by the relator to oust the respondent from the office of sheriff because of the alleged violation of the corrupt practices act of the state of Minnesota. The alleged misconduct grew out of the following transaction: In the spring of 1906 the respondent Bates, then sheriff, one Miles and one Armstead were conspicuous candidates or possibilities for the Republican nomination for the next term as sheriff of St. Louis county. Miles showed to Bates a letter which he claimed to have received from Armstead. The letter set forth that Armstead had great political strength with respect to the nomination for sheriff in the approaching

primary election, that Armstead was not anxious to mix in
the fight, and that if Miles would run, Armstead would stay
out and do all he could to help him. The result of the inter-
view was an agreement in words and figures as follows:

"Duluth, Minn., March 30, 1906.

"In return for $500.00 (five hundred dollars), one hundred
of which has been paid and $400.00 (four hundred dollars) of
which is to be paid on or before the last day of filing, I agree
to file for the office of sheriff of St. Louis County before the
coming election, and to withdraw from the fight on or before
the last day of filing. I do this to keep out any opposition
to Mr. Bates, and in order to split up the vote if any other
candidate should get into the field.

"(Signed)     JACK MILES."

Respondent signed the contract and paid Miles at the time
$75 and afterward $375 more. The further facts are fully
set forth in said opinion, and on that state of facts the relator
applied for a writ of *quo warranto.* The opinion is by
Jaggard, J. After stating the facts it is said:

"The essential question in this case is whether or not the
respondent, Bates, was a candidate for the office of sheriff
of St. Louis county at the time at which he entered into the
agreement with Miles. If he was then a candidate, within
the meaning of the corrupt practices act, he would not be
entitled to hold the office, and òther questions would be pre-
sented. If he was not a candidate at that time, and was not
within the prohibition or requirements of the corrupt prac-
tices act, then the relator is entitled to no relief."

The court cites the corrupt practices act and also certain
sections of the primary election law of the state of Minnesota,
and says that the corrupt practices act plainly distinguishes
between a "candidate for nomination to any elective office"
and a "candidate for any elective office." Sec. 350 of the
primary law of that state requires the filing of an affidavit
of expenditures by "a candidate for nomination or election
to an elective office." In discussing the question when a
person under the direct primary system of that state becomes

a candidate, under the primary law and the corrupt practices act, the court said:

"A party office-holder, under the direct primary system, passes through two similar preliminary stages: (1) Where, having filed his affidavit, he becomes a candidate for nomination by his party at a primary election. (2) Where he has been elected as his party's nominee and is a candidate for election. In the case of the nominee of a convention, the candidate files a list of his expenses, beginning with a date which the law does not fix, but which is determined in accordance with its general rules. It is apparently left to the candidate to fix that date in good faith, and perhaps at his peril. In case of a nomination by direct primary election, the statute definitely prescribes the time, viz., when the eligible person files the affidavit of his intention. As to expenses after that date, he must file a verified statement, but as to those which were incurred before it he is not required so to do. Suppose an office-seeker spends money with the intention of becoming a candidate for nomination at the approaching primary election, but changes his mind and does not file. Must he make a verified statement of his expenses? Failing to do this, is he liable to prosecution for a misdemeanor? Clearly not. No more was the respondent required to make the statement of his expenditures anterior to the time at which he filed his affidavit and thus became a candidate."

The court there holds under the laws of Minnesota that a candidate was not required to file an itemized statement of his expenditures to promote his nomination prior to the date of filing his affidavit of nomination; that under the laws of that state, after filing said affidavit, the party became a candidate for nomination and not before. The court in that case made the following observations:

"This construction is subject to the objection that it might enable the office-seeker to expend large sums of money to help him secure a nomination, and, by filing as late as the law allows, to escape its penalties, and, in effect, to evade its provisions. The time of filing is, however, so long before the primary election, and that time so long before the actual

election, as to make that evil seem remote. In ordinary experience, it is likely to occur that the advantage of publicity secured by filing early will overcome any disposition to delay filing with a view to reducing the expense to be reported, and candidates will continue to regulate their filings with reference to considerations of general expediency. However this may be, it is for the legislature, and not for the courts, to remedy the imperfections which may arise in the administration of the law. We have to deal with it as it has been enacted. As enacted, we think that the candidate for nomination upon whom are imposed penalties by the corrupt practices act is, under the direct primary election law, a person who has filed his affidavit of intention, and has thereby become a candidate for nomination under its terms. Before he becomes such candidate, he is not within the provisions of the corrupt practices act.''

The court there holds that a person only becomes a candidate after he has filed his affidavit, and that before he files such affidavit, so far as expenditures of money were concerned, he did not come within the provisions of the corrupt practices act of that state, and might spend any amount that he desired to in aid or promotion of his nomination.

The primary election law of this state is different from the primary election law of Minnesota and the corrupt practices act of that state in some particulars. The intent and purpose of the legislature in enacting said secs. 24 and 25 of the primary law was to prevent the large expenditures of money or property by a person, in aid or promotion of his own nomination to any office under the provisions of said law. The first sentence of said sec. 24 is as follows: ''No person shall, in order to aid or promote his own nomination to an office under the provisions of this law, directly or indirectly, himself or through any other person, give, pay, expend or contribute, promise to give, pay, expend or contribute any money or other valuable thing or service, except for personal expenses,'' etc. And the last sentence of said section is as follows: ''*Provided,* That no candidate for nomination to any office at any primary held under the provisions of this act

shall expend for personal expense *or at all* in order to aid or promote his own nomination to such office, more than fifteen per cent of the yearly compensation or salary attached to such office.''

It is clear that the legislature intended by the language there used that no person should be permitted to expend, to aid or promote his own nomination to an office, more than fifteen per cent of the yearly salary of such office, and he is prohibited from expending for personal expenses ''or at all'' in order to aid or promote his own nomination more than fifteen per cent of the yearly compensation of such office. A positive prohibition is thereby placed upon the expenditure in aid or promotion of the nomination of a person more than fifteen per cent of the salary for a single year. ''Personal expenses'' are accurately defined in said sec. 24. But the law provides for other expenditures than those defined as personal. Sec. 6 provides that a fee shall be paid, or in lieu thereof a petition shall be filed on behalf of each candidate for office; and sec. 7 provides that the fee to be paid on behalf of any candidate in case no petition be filed asking for his nomination shall be, for any office with a salary of $300 or less, the sum of $2; and when such salary exceeds $300 per annum, an additional sum equal to one per cent thereof on such excess. The law also provides the number of signatures required for the nomination of a candidate by petition, and clearly contemplates that a nomination by payment of the fee requires an expenditure of money, and also a nomination by petition requires the expenditure of money, and so far as the expenditure of money by candidates is concerned, the entire provisions of said act in regard to the nomination of a candidate by the payment of a fee or by petition and the provisions for personal expenses must be construed together. The itemized statement required to be filed by the candidate by the provisions of sec. 25 requires the candidate to set forth ''each sum of money and thing of value or any consideration whatever, contributed, paid or promised by him or anyone for him, with his knowledge or acquiescence for the purpose of securing or influencing or in any way affecting his nomina-

tion to said office,'' as well as the personal expenses defined by said sec. 24.

The candidate who pays the fee authorized by said law for his nomination must render an account of that in such statement. The candidate who has been nominated by petition must set forth an itemized statement of the expenditures he has made in procuring such petition and all other expenses connected therewith, as well as the expenses defined as ''personal expenses'' under the provisions of said sec. 24; and the candidate is prohibited from expending more than fifteen per cent of one year's salary of the office sought, for all of said expenses above referred to, incurred to aid or promote his nomination.

The contention that ''a person is not a candidate until after he files his nomination papers'' and is not required to include in the itemized statement of expenditures to be filed by him any items of expenditure that were contracted or paid prior to filing his nomination papers is directly against the plain intent of said law. It was suggested on the argument in favor of said contention that a person might expend a large amount of money in ascertaining whether he would be a candidate and finally conclude that he would not be a candidate. In such a case if the person did not enter the race for the office to the extent of having his name placed on the primary ballot or voted for at the election, he would not be required to render an account of the money so expended, and of course would not have to file an itemized statement of his expenditures. It is not intended to include persons who may be candidates all of the year around except on election day. It only applies to a man who finally submits his name to the voters on election day. Only candidates whose names are on the primary ticket for nomination or who become candidates by having their names written on the ballot are required to file such itemized statements. Said sec. 24 provides that ''No person shall in order to aid or promote his own nomination to an office,'' etc. It does not say that ''No *candidate* after he has filed his nomination papers shall,'' etc.; but even if the word ''candi-

date" instead of "person" were there used, the conclusion would be no different.

In *State ex rel. Brady v. Bates, supra,* where the court held that a person did not become a candidate until he filed his nomination papers, under the laws of Minnesota, the court said: "This construction is subject to the objection that it might enable the office-seeker to expend large sums of money to help him secure a nomination, and, by filing as late as the law allows, to escape its penalties, and, in effect, to evade its provisions." That statement seems to be weakened by the further statement of that court that the filing is made so long before the election as to make the evil mentioned seem remote. The time under the Minnesota law was twenty days, and in our view not so remote as to prevent what the law was intended to prohibit. I am not in accord with that statement, for it is well known that candidates for nomination at primaries may expend thousands of dollars in promoting their nomination, and have their political machinery in such perfect running order that no further expenditure of money will be required after the nomination papers are filed to keep it running effectively until the last vote is cast at the primary election. Under our primary election law nomination papers may be filed as late as thirty days before the date of the primary election, and to say that thirty days is so long a time as to make the evil attending such large expenditures of money "seem too remote" to be considered would seem to us childlike in its simplicity of belief and suggestion.

Under said primary law to hold that a person may legally expend thousands of dollars in promoting his nomination to an office so long as he does it prior to the date of filing his nomination papers would permit him to do just what said law was intended to prohibit him from doing. It was not the legislative intention to permit a candidate to debauch the electorate and press of the state, if it were possible to do so by a large expenditure of money, provided he did it thirty days before the primary election. The intention was to prohibit a large expenditure of money, or what is called a check-book campaign, in procuring the nomination of any candidate,

whether the expenditure is made either before or after the filing of his nomination papers. If a contrary construction were placed upon said law, truly might it be classed as a law for the rich man and not a poor man's law as it was termed during its passage through the legislature.

## When is a Person a Candidate?

The contention that a person is not a candidate until after he files his nomination papers is not in accord with the clear purpose and intent of the primary election law. It is provided among other things in sec. 14 of said act that a blank space shall be provided under each official heading in order that a voter may write in the name of a candidate for any office. It is possible under that provision for a person to be nominated for an office who has not been nominated by paying the fee or filing a petition as required under the provisions of secs. 6 and 7 of said primary election law and whose name is not printed on the ballot. And in such a case the candidate thus selected must file an itemized statement of expenditures the same as a person whose name has been placed on the primary ballot by filing the required nomination papers and paying the fee or by petition.

As above stated, a person may be a candidate at a primary election whose name is not printed on the ballot. In that case he must secure a sufficient number of electors who will write his name on the ballot on election day to accomplish his nomination. If he succeeds in that manner in securing a sufficient number of votes to nominate him, he will be entitled to have his name certified and placed on the official ballot at the ensuing general election. Such a person would nevertheless be a candidate for nomination and would have become amenable to the requirements of the law, and would no more be allowed to violate the penal provision of the primary law than the man whose name was legally printed on the ballot; still there would be as many opportunities open for the expenditure of money and making promises for the candidate whose name was not printed on the ballot as to the man whose name is printed on the ballot. The law was in-

tended to apply to all persons who may in any way be candidates to be voted for at the primary election and all such are amenable to the provisions of the law. It is clear to us that a man is a candidate for an office at the time he begins to seek such office or lay his plans to procure the nomination for such office.

In *Leonard v. Commonwealth,* 112 Pa. 607, 4 Atl. 220, the court had under consideration the question of when a man became a candidate for an office under the provisions of the constitution and statutes of Pennsylvania, and in the course of the opinion the court said:

"The word 'candidate' in the constitution is to be understood in its ordinary popular meaning, as the people understood it whose votes at the polls gave that instrument the force and effect of organic law. Webster defines the word to mean 'one who seeks or aspires to some office or privilege, or who offers himself for the same.' This is the popular meaning of the word 'candidate.' It is doubtless the meaning which the members of the constitutional convention attached to it, and the sense in which the people regarded it when they came to vote. We therefore say, in every-day life, 'that a man is a candidate for an office when he is seeking such office. It is begging the question to say that he is only a candidate after nomination, for many persons have been elected to office who were never nominated at all. We hold, therefore, that the defendant was a candidate for office within the meaning of the constitution as well as the act of 1881. If, while such candidate, he was guilty of either bribery, fraud, or the wilful violation of any election law, he comes directly within the terms of the constitutional provision. . . . . When laws are made by a popular government, that is to say, 'a government of the people, by the people, and for the people,' we may safely assume that words in a statute or a constitution are used in a sense in which the people who made the statute or constitution understood them. . . . . As before observed, the constitution must be construed liberally so as to carry out, and not defeat, the purpose for which it was adopted. If we give it the narrow construction claimed for it, a candidate

for office might resort to all manner of bribery and fraud in procuring his nomination; yet if he conduct himself properly after his nomination, he could wholly evade the constitutional prohibition. This applies with special force to cases where a nomination is the equivalent to an election. In such instance the nominee may well be an honest man between his nomination and election, for he has no motive to be a rogue.''

So, under our primary election law a person is considered to be and is a candidate for an office when he begins to seek a nomination for that office, and if we give the narrow construction contended for by counsel to the term ''candidate,'' the very object and purpose of the statute would be defeated and a candidate for office might resort to all manner of bribery, promises and expenditures of money in procuring his nomination up to the time he filed his nomination papers, and if he should after that time not commit any bribery, not make any promises, and not make any expenditures of money in aid or promotion of his nomination, he would wholly evade the penal provisions of said statute; and as said in *Leonard v. Commonwealth, supra,* ''This applies with special force to cases where a nomination is the equivalent to an election. In such instance· the nominee may well be an honest man between his nomination and election, for he has no motive to be a rogue.''

So under our primary election law, if a candidate were permitted to expend any amount of money he desired to expend· prior to the date of filing his nomination papers, and only had to account for the money that he expended between the filing of said papers and the primary election, there would be no motive for him to violate the law.

A person seeking a nomination under our primary election law for an office becomes a candidate whenever he begins to lay his plans to aid· or promote his nomination. Any other construction placed upon said act would be contrary to the letter as well as the spirit of said act, for the clear intention is to bring every person seeking a nomination at a primary election within the prohibitory provisions of said act just as soon as he does some overt act or thing in promoting his candidacy or in aid or promotion of his nomination. We therefore

hold that a person who begins and continues to seek a nomination for a public office, under the provisions of said act, up to and including the day of the primary election, must file the itemized account provided for by said secs. 24 and 25, and is subject and amenable to the penal provision of said act.

*Failure to Provide for Nomination of Precinct Officers.*

It is contended that said primary election law makes no provision for the nomination of precinct officers and is defective in that regard. It is provided, among other things, in sec. 29 of said act as follows: "A county or state central committee may elect its chairman, secretary or other officer, and fill vacancies in said committee, and shall have the power to make its own rules and regulations, and prepare and announce party principles, and platforms, call platform conventions, elect delegates to platform conventions, county, state or national, provide for the election of such delegates otherwise, fill vacancies on the ticket, provide for the nomination of candidates to fill vacancies, or for offices not required to be nominated as herein specified, and may perform all other functions inherent in such organizations by virtue of law or custom, not inconsistent with the terms of this law, the same as if this law had not been enacted."

That section conclusively provides a method for the nomination of precinct officers. It provides for the filling of certain vacancies and for the nomination of candidates to fill offices which are not required to be nominated under the provisions of said act. There being no provision for the nomination of precinct officers in said act, those officers may be nominated in any reasonable way that may be provided by the party organization. Thus said act leaves the nomination of precinct officers with the party county or precinct organizations and provides for such nominations in that way. There is nothing in said contention.

We therefore conclude that the provisions of said primary election law in regard to the voter being required to vote for a second choice, where there are more than twice as many candidates as there are positions to fill, are mandatory; that

a failure to vote for a second choice would not invalidate the entire ballot but only so far as it applied to the candidate for an office where a second choice vote is required; that the persons or candidates for nomination at a primary election are required to file with the proper officer an itemized statement of their expenditures as provided by secs. 24 and 25 of said act covering and including all such expenses from the time such person or candidate began seeking such office or began laying his plans or doing some other overt act to aid or promote his nomination to the office sought by him, whether his name be placed upon the ballot by filing nomination papers and paying the proper fee or by filing his petition, or by procuring voters to write his name in the blank space left on the primary ballot for writing a candidate's name thereon; and that said act makes ample provision for the nomination of precinct officers.

The alternative writ is quashed and the peremptory writ denied. No costs are allowed to either party in this proceeding.

AILSHIE, J., Concurring.—The chief justice has so fully and clearly covered the questions raised that there seems but little left to be said. The importance of this case and the newness of the field of legislation covered prompt me to add a few observations to what has been so logically stated by the principal opinion and in which I fully concur.

I shall briefly state some additional reasons which have led me to the unavoidable conclusion at which the court has arrived in this case, with reference both to the mandatory nature of the first and second choice requirements of the law and the expenditures by candidates.

## *First and Second Choice.*

In the outset it should be remembered that the right to vote or to exercise the elective franchise is not an inalienable right but is rather a privilege conferred by the state. (15 Cyc. 280, 281.) It is a purely political right granted by the people collectively in the exercise of the political powers of the state.

In this state the framers of the constitution by sec. 3, art. 6 thereof, placed certain restrictions and limitations upon the right to vote and hold office. Not content, however, with these limitations and restrictions and differing from many other state constitutions, they added the provisions of sec. 4, art. 6, which say: "The legislature may prescribe qualifications, limitations, and conditions for the right of suffrage additional to those prescribed in this article, but shall never annul any of the provisions in this article contained."

It follows unmistakably that under our constitution the legislature has the right to prescribe the "limitations and conditions" under which the right of suffrage may be exercised, and that it was within the legislative discretion and power to say to every citizen that he shall under certain circumstances, if he votes at all, indicate both a first and a second choice for an officer. Every voter takes the chances at every election of losing his vote in so far as the selection of his particular candidate is concerned, but the legislature has by this act endeavored to in a measure protect each voter against such contingency unless an opposing candidate has obtained a majority of all the votes cast.

When I consider the moving purpose of the lawmakers in the enactment of this law and the imperative form of the verb used in section 14 of the act, and the reasons which must have led to the insertion of the second choice feature of the act, I can arrive at no other rational conclusion than that it was intended to be mandatory. The same form of verb is used in directing the voter to "mark only" his party ticket and to "not vote" for the same person for both first and second choice, and yet I presume no one would contend that these provisions are not mandatory. It was intended to reduce to a minimum the possibilities of thwarting the will and purpose of the people in the selection of party candidates, and at the same time have every choice or selection represent as nearly as might be a majority of the electors of his party. This purpose can only be accomplished, if at all, through a mandatory second choice. An optional second choice would at once open up avenues and possibilities for organization and deception of

voters that would render the second choice a snare for the unwary and a plaything for the crafty. If only optional, it would at once become a race between opposing candidates and their supporters to see who could organize the largest number of his followers to vote only a first choice so that no unbiased preference might be expressed by his supporters to be counted in the contingency of no first choice selection. Such an organization would give the best organizer the largest possibility of second choice votes from the first choice supporters of the opposing candidates. The race would then be won by the best organizer and manipulator. This is one of the things that law was intended to discourage and minimize as far as possible in the selection of candidates. However far in actual practice the law may fall short of accomplishing its purpose in securing a free and unbiased expression of the people in the selection of party nominees, it will still remain a fact that the spirit and intent of the law is written large all through the act and points to the unmistakable purpose to make the second choice mandatory.

It was suggested on argument that a voter might have no second choice. That is wholly improbable with one who cares to vote at all. After the voter has expressed his first choice, he will in all probability still have a *preference* among the other candidates whose names are printed on the ballot, but if he should be unable to choose between them he may write the name of someone else on his ballot. There are as many chances that a voter may not find his *first choice* printed on the ballot as that his second choice may not be there. It sometimes happens that the voter's *first choice* is not a candidate for office, but that does not deprive him of doing the next best thing in choosing among those who are candidates.

### *Expenditures. of Candidates.*

On the question of expenditures by candidates but little has been said by counsel for petitioner. Counsel who argued the case on behalf of the secretary of state take different views, the assistant attorney general contending that secs. 24, 25, 26, and 28, limiting the expenditures, apply only to a candidate

after his nomination paper or petition has been filed and he has accepted the nomination; while other counsel insist that these sections of the act cover all expenditures a candidate may make at any time for the purpose of furthering his interests and promoting his nomination. Now, it seems to me that the unbiased person reading these provisions of the law, which are in very plain and simple language, would never suspect, unless it was suggested to him, that there is any limitation as to time either expressed or implied in the statute. It is only the suggestion that we construe into it a limitation that raises any question or discussion at all on that point. The expenditure is limited, but the time within which that limited expenditure may be made is wholly unlimited. The *purpose* of the expenditure is the test of its lawfulness without reference to time.

In a popular government the laws are supposed to reflect the will of the people, and to be in such language and form as the people understand, and thus we differ from the rule of Caligula, who wrote his edicts so small and hung them so high the people could not read them. Modern laws are made to be read by the people, and indeed the law presumes that every one of its subjects knows and understands its terms and provisions. In order, therefore, to reach a reasonable and sensible construction of the law, words that are in common daily use among the people should be given the same meaning in the statute as they have among the great mass of the people who are expected to read, obey and uphold the law. It is a plain perversion of any law to construe it in the light of the logic of refined technicalities. The farmer, the miner, and the day laborer all alike have a common and very clear understanding of the meaning of words in daily use among them. To them and the great mass and body of the people the word "candidate" has a well-defined meaning. They understand a candidate to be one who is presenting himself as an aspirant or applicant for an office or position—one who is seeking a nomination or election to a position or office.

When a man is spending his money in employing and sending out workers, or perfecting an organization, or advertising

and exploiting himself, or influencing public opinion in his favor or against an opponent, or in numerous other ways that present themselves to the office-seeker, for the purpose of increasing and enhancing his ultimate chances of nomination for a given office, he is for all practical purposes a "candidate" for such nomination, and the people so understand it. In this respect the reasoning of the learned justice in *Leonard v. Commonwealth,* 112 Pa. 607, 4 Atl. 220, is unanswerable. Our primary election law does not attempt to define who is a candidate for nomination. On the contrary, it recognizes the right of every elector qualified to hold the office to be a candidate for nomination to that office. It attempts to regulate the conduct of a candidate in seeking a nomination, and prescribes terms and conditions on which he can have his name printed on the official primary ballot, but the fact that he neglects or fails to get his name printed on the ballot does not prevent his being a candidate, although it greatly diminishes his chances for the nomination. (See *State v. Nichols,* 50 Wash. 508, 97 Pac. 728.)

That anyone is a candidate who seeks a nomination at the primary, whether his name be printed on the official ballot or not, is borne out by the statute itself, and is accentuated by both secs. 14 and 30, wherein it calls one a "candidate" whose name is written on the ballot by the elector himself.

In order to command respect for and compliance with the requirements and mandates of the law, the legislature thought it wise to incorporate in the act certain prohibitive and penal provisions which correspond very closely with provisions of the "criminal practices acts" of some of the states and very similar to provisions found in the primary election laws of the state of Washington (1909 Sess. Laws Wash., pp. 176–179). These are proper incidents to such a law, and highly necessary to its efficiency in order to enable the law to reach out and lay hold on those who refuse it obedience. They deal chiefly with those who tamper with and influence voters and attempt to control the means and avenues of publicity. It pronounces severe penalties for its violation. The purpose was to give worth and ability an even show in the race for

public office as against trickery, cunning and money. That idea has been unmistakably written into the law, and it only remains to be seen whether it can be accomplished in practice as it has been written in theory.

But it is said that the statute does not say *when* the candidate shall begin to keep account of his expenditures and does not specify the period of time *in or during which* the limitation of expenditures runs. This is clearly answered by sec. 24 of the act. It says, *"No person shall, in order to aid or promote his own nomination to an office* . . . . give, pay, expend or contribute or promise to give, pay, expend or contribute,"* etc., any money or thing of value except for personal expenses, and then the section is ended with the proviso that, *"No candidate for nomination to any office at any primary . . . . shall expend for personal expenses or at all in order to aid or promote his own nomination to such office more than fifteen per cent of yearly compensation or salary attached to such office."* When the law says that no person *"shall expend for personal expenses or at all"* exceeding a fixed sum, it seems to me that covers *all* times and *all* expenditures. The important question is not *when* did a man become a candidate, but *did* he expend money at any time in violation of the statute to "aid or promote" his nomination to office. It becomes purely a question of fact in each case to be established in the same manner that any other fact is established. This is the plain and natural import of the language written into the law, and any other construction would be strained and wholly unjustified.

The purposes and object of this law are clear, and its main and substantial features are not difficult to understand. In many of its minor details it might have been made much more explicit, but those are more matters of form and detail of administration than of substance.